NATHAN D. RIVERA, ISB #8339
Attorney at Law
Rivera Law
53 S. Shilling
PO Box 700
Blackfoot, ID 83221
Telephone: (208) 785-5618
Facsimile: (208) 785-4858
genera@riveralawyers.com

Attorney for Defendant Ryan Vandyke

---

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>　　　Plaintiff,<br><br>v.<br><br>RYAN R. VANDYKE,<br>　　　Defendant. | Case No. 4:23-cr-00193-BLW-1<br><br>MOTION SEEKING PERMISSION TO FILE<br>AN AMICUS BRIEF |

COMES NOW, Defendant, by and through his attorney, NATHAN D. RIVERA, and

hereby seeks permission for Defendant's counsel to be allowed to attach two (2) amicus briefs to

accompany his Responsive Brief.

DATED this 27ᵗʰ day of November 2023.

　　　　　　　　　　　　　　　　　　　　NATHAN D. RIVERA
　　　　　　　　　　　　　　　　　　　　Attorney for Defendant

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 28th, 2023, I filed the foregoing electronically
through the CM/ECF system, which caused the following parties to be served by electronic
means, as more fully reflected on the Notice of Electronic Filing:

Jack B. Haycock
U.S. Attorney
Jack.Haycock@usdoj.gov

　　　　　　　　　　　　　　　　　　　　/s/Nathan D. Rivera
　　　　　　　　　　　　　　　　　　　　NATHAN D. RIVERA

No. 22-915

In The
# Supreme Court of the United States

———————— ♦ ————————

UNITED STATES,

*Petitioner,*

v.

ZACKEY RAHIMI,

*Respondent.*

———————— ♦ ————————

**On Writ Of Certiorari To The
United States Court Of Appeals
For The Fifth Circuit**

———————— ♦ ————————

**BRIEF OF AMICI CURIAE PROFESSORS OF
SECOND AMENDMENT LAW, THE SECOND
AMENDMENT LAW CENTER, AND THE
INDEPENDENCE INSTITUTE IN SUPPORT
OF RESPONDENT AND AFFIRMANCE**

———————— ♦ ————————

KONSTADINOS T. MOROS*
MICHEL & ASSOCIATES, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, California 90802
(562) 216-4444
kmoros@michellawyers.com
*Application pending for
  admission to this court.
*Counsel for Amicus Curiae*

DAVID B. KOPEL
INDEPENDENCE INSTITUTE
727 East 16th Avenue
Denver, Colorado 80203
(303) 279-6536
david@i2i.org
*Counsel of Record*

October 4, 2023

———————— ♦ ————————

COCKLE LEGAL BRIEFS (800) 225-6964
WWW.COCKLELEGALBRIEFS.COM

i

## TABLE OF CONTENTS

Page

TABLE OF CONTENTS ..................................... i

TABLE OF AUTHORITIES ................................ ii

AMICI CURIAE STATEMENT OF INTEREST ..... 1

SUMMARY OF ARGUMENT ............................. 2

ARGUMENT ....................................................... 4

   I.  The original public meaning of the Second Amendment is not infringed by laws to take arms from persons proven to be dangerous to others ......................................... 4

       A.  While Petitioner's amici rely on invidious discrimination, constitutional enactments repudiate such discrimination for arms rights.................................... 7

          1.  The 1689 English Bill of Rights ..... 8

          2.  The 1791 Second Amendment ........ 12

          3.  The 1865 Thirteenth Amendment ... 14

          4.  The 1868 Fourteenth Amendment .... 19

          5.  Indians........................................... 22

          6.  Disloyalty in wartime ..................... 24

          7.  Conclusion .................................... 26

       B.  Synthesis of disarmament precedents..... 26

       C.  Applying "law-abiding responsible citizens".................................................... 28

   II.  The defects of section 922(g)(8) ................. 28

   III.  Amicus briefs ............................................ 32

CONCLUSION.................................................... 35

ii

## TABLE OF AUTHORITIES

Page

U.S. SUPREME COURT CASES

*Calder v. Bull*, 3 U.S. 386 (1798) .................................21

*Civil Rights Cases*, 103 U.S. 3 (1883).........................18

*Dimick v. Schiedt*, 293 U.S. 474 (1935)........................6

*District of Columbia v. Heller*, 554 U.S. 570 (2008)...........................................1, 2, 6, 8, 32, 34, 35

*Ex Parte Milligan*, 71 U.S. 2 (1866)............................25

*Johnson v. Eisentrager*, 339 U.S. 763 (1950).............25

*McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010)......................................1, 2, 14, 19, 21, 32, 34

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) .....................2, 6, 7, 14, 32-35

*New York State Rifle & Pistol Ass'n. v. City of New York, New York*, 140 S. Ct. 1525 (2020) ..........35

*Scott v. Sandford*, 60 U.S. 393 (1857)........................21

*Stromberg v. California*, 283 U.S. 359 (1931).............32

*Students for Fair Admissions v. President and Fellows of Harvard College*, 143 S. Ct. 2141 (2023)....................................................................33

*United States v. Lopez*, 514 U.S. 549 (1995)...............30

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990)....................................................................28

iii

TABLE OF AUTHORITIES—Continued

Page

OTHER CASES

*Dabbs v. State*, 39 Ark. 353 (1885) ............................13

*Neal v. Farmer*, 14 Ga. 185 (1853)..............................18

*Nunn v. State*, 1 Ga. 243 (1846)....................................6

*Range v. Att'y Gen. United States of Am.*, 69 F.4th 96 (3d Cir. 2023)........................................5, 25

*Simpson v. State*, 13 Tenn. 356 (1833) .......................13

*State v. Burgoyne*, 75 Tenn. 173 (1881) .....................13

*State v. Newsom*, 27 N.C. 250 (1844).........................20

*United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023) ........................................................................5

*United States v. Jackson*, 2023 WL 5605618 (8th Cir., Aug. 30, 2023) .................................................24

*United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023) ........................................................................7

*Watson v. Stone*, 148 Fla. 516 (1941)....................13, 14

U.S. CONSTITUTION AND DECLARATION

Declaration of Independence (U.S. 1776).............16, 21

U.S. Const. amend. I ..................................................12

U.S. Const. amend. II ..........1, 3, 4, 7, 12, 13, 17-21, 23, 25-27, 29, 30, 32-35

U.S. Const. amend. V ................................................25

U.S. Const. amend. XIII .............................3, 14, 18, 19

U.S. Const. amend. XIV, §1 ...............3, 6, 19-21, 23, 32

iv

TABLE OF AUTHORITIES—Continued

Page

U.S. Const. amend. XIV, §2 ........................................23

U.S. Const. art. I, §2 ...................................................23

U.S. Const. art. I, §8 ................................. 22, 30, 31, 34

U.S. Const. art. I, §9 ...................................................14

U.S. Const. art. II, §1 ...........................................25, 26

U.S. Const. art. VI ......................................................26

OTHER CONSTITUTIONS AND DECLARATIONS

1 Wm. & Mary ch. 2, §7 (1689), English Bill of
    Rights ........................................................................8

Magna Carta (Eng. 1215) ............................................8

N.H. Const., Bill of Rights, art. X ..............................16

Resolution   of   North   Carolina's   Proposed
    Amendments, in 4 DEBATES ON THE ADOPTION
    OF THE FEDERAL CONSTITUTION 243 (Jonathan
    Elliot ed., 1836) .......................................................16

Resolution of Virginia's Proposed Amendments,
    in 3 DEBATES ON THE ADOPTION OF THE FEDERAL
    CONSTITUTION 657 (Jonathan Elliot ed., 1836).......16

Tenn. Const. of 1796, art. 11, §2 .................................16

U.S. LEGISLATION

15 C.F.R. §746.8 .........................................................23

8 U.S.C. §1401, Indian Citizenship Act .....................23

18 U.S.C. §922(g) ..................................................30, 31

18 U.S.C. §922(g)(5)(B) ..........................................24, 28

v

TABLE OF AUTHORITIES—Continued

Page

18 U.S.C. §922(g)(7) ...................................................24

18 U.S.C. §922(g)(8) ...............................5, 28-30, 32, 36

18 U.S.C. §922(g)(8)(C)(i) ........................... 4, 28, 29, 36

18 U.S.C. §922(g)(8)(C)(ii) .......................................4, 29

18 U.S.C. §922(q)(2)(B)(i) (held unconstitutional) ...... 30

18 U.S.C. §922(y)(2)(A) ...............................................24

25 U.S.C. §71 ...............................................................23

S. 2913, 102d Cong. (1992) .........................................29

OTHER LEGISLATION AND STATE ACTION

14 Car. 2 ch. 3, §13 (1662) (Militia Act)...................5, 8

1 Wm. & Mary ch. 15 (1689) ........................................9

33 & 34 Vict. ch. 57 (1870) ...........................................9

1756 Md. L. 34 (Feb. sess.) ..........................................11

1756 Md. L. 7 (Sept. sess.) ...........................................11

1893 Fla. L. 71, ch. 4147 .............................................13

1901 Fla. L. 57, ch. 4928 .............................................13

5 THE STATUTES AT LARGE OF PENNSYLVANIA FROM
    1682 TO 1801 (Stanley Ray ed., 1898) ...................11

52 ARCHIVES OF MARYLAND (J. Hall Pleasants ed.,
    1935)........................................................................ 11

Hening, William Waller, 7 THE STATUTES AT
    LARGE; BEING A COLLECTION OF ALL THE LAWS
    OF VIRGINIA, FROM THE FIRST SESSION OF THE
    LEGISLATURE, IN THE YEAR 1619 (1823)...................11

vi

TABLE OF AUTHORITIES—Continued

Page

BOOKS

Adams, Samuel (E.A.), BOSTON GAZ., Feb. 27,
1769, in 1 THE WRITINGS OF SAMUEL ADAMS
(Harry Alonzo Cushing ed., 1904) .........................15

Barondes, Royce, THE CIVIL RIGHT TO KEEP AND
BEAR ARMS: FEDERAL AND MISSOURI
PERSPECTIVES (2023 ed.) .........................................32

Blizard, William, DESULTORY REFLECTIONS ON
POLICE (1785).........................................................27

Campbell, Charles, HISTORY OF THE COLONY AND
ANCIENT DOMINION OF VIRGINIA (1860) ...................10

Cobb, Charles, Jr., "THIS NONVIOLENT STUFF'LL
GET YOU KILLED": HOW GUNS MADE THE CIVIL
RIGHTS MOVEMENT POSSIBLE (2014) ........................19

Douglass, Frederick, 4 THE FREDERICK DOUGLASS
PAPERS (J. Blassingame & J. McKivigan eds.,
1991) ......................................................................20

FEDERAL AND STATE CONSTITUTIONS COLONIAL
CHARTERS, AND OTHER ORGANIC LAWS OF THE
STATES, TERRITORIES, AND COLONIES NOW OR
HERETOFORE FORMING THE UNITED STATES OF
AMERICA (Francis Newton Thorpe ed., 1909) .....9, 10

Henry, Patrick, *The War Inevitable*, Speech at
the Second Revolutionary Convention of
Virginia, Mar. 23, 1775, in William Wirt,
SKETCHES OF THE LIFE AND CHARACTER OF
PATRICK HENRY (1817)......................................15, 16

vii

TABLE OF AUTHORITIES—Continued

Page

Jefferson, Thomas, letter to Henry Lee (May 8, 1825), in 16 THE WRITINGS OF THOMAS JEFFERSON 117 (Lipscomb ed., 1903) .......................15

Johnson, Nicholas, David Kopel, George Mocsary, Gregory Wallace, & Donald Kilmer, FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS AND POLICY (3d ed. 2022) .......... 6, 8, 9, 11, 13

Johnston, Shona, Papists in a Protestant World: The Catholic Anglo-Atlantic in the Seventeenth Century (2011) (Ph.D. dissertation, Georgetown University) ...............................................................10

Madison, James, Notes for Speech on Constitutional Amendments, June 8, 1789, in 12 MADISON PAPERS 193 (C. Hobson & R. Rutland eds., 1979) ...............................................12

Maine, Henry, ANCIENT LAW (1861) ..........................7, 8

*Matthew* 5:34 ...............................................................25

OXFORD ENGLISH DICT. (Online, Mar. 2023) .............6, 8

Parton, James, THE LIFE OF HORACE GREELEY (1869) ...............................................................18, 19

Sidney, Algernon, DISCOURSES CONCERNING GOVERNMENT (Thomas West ed., 1996) (1698) ........15

Spooner, Lysander, THE UNCONSTITUTIONALITY OF SLAVERY (1845) .....................................................18

Tiffany, Joel, A TREATISE ON THE UNCONSTITUTIONALITY OF AMERICAN SLAVERY (1850) ...............................................................17, 18

viii

TABLE OF AUTHORITIES—Continued

Page

Tsesis, Alexander, FOR LIBERTY AND EQUALITY: THE LIFE AND TIMES OF THE DECLARATION OF INDEPENDENCE (2012) ..............................................17

Westerkamp, Marilyn, THE PASSION OF ANNE HUTCHINSON (2021)..................................................10

ARTICLES

Anglemyer, Andrew, et al., *The Accessibility of Firearms and Risk for Suicide and Homicide Victimization among Household Members: A Systematic Review and Meta–analysis*, 160 Annals of Internal Med. 101 (2014).......................30

Campbell, Jacquelyn, et al., *Risk Factors for Femicide in Abusive Relationships*, 93 Am. J. Pub. Health 1089 (2003) .........................................30

Charles, Patrick, *The Fugazi Second Amendment: Bruen's Text, History, and Tradition Problem and How to Fix It*, 71 Clev. St. L. Rev. 623 (2023)......................................................................33

Cornell, Saul, *Cherry-picked history and ideology-driven outcomes: Bruen's originalist distortions*, Scotusblog.com, June 27, 2022 ............34

Engdahl, David, *The Necessary and Proper Clause as an Intrinsic Restraint on Federal Lawmaking Power*, 22 Harv. J.L. & Pub. Pol'y 107 (1998).............................................................31

Greenlee, Joseph, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249 (2020)...........................10

ix

TABLE OF AUTHORITIES—Continued

Page

Hardy, David, *Ducking the Bullet:* District of Columbia v. Heller *and the Stevens Dissent*, 2010 Cardozo L. Rev. de novo 6 ..............................12

Kopel, David & Glenn Reynolds, *Taking Federalism Seriously: Lopez and the Partial Birth Abortion Ban Act*, 30 Conn. L. Rev. 59 (1997)......................................................................31

Rakove, Jack, Twitter/X, Aug. 27, 2023.....................34

Riley, Angela, *Indians and Guns*, 100 Geo. L.J. 1675 (2012).............................................................23

*Senators File an Enemy-of-the-Court Brief*, Wall St. J., Aug. 19, 2019 ................................................35

Sunstein, Cass, *On Analogical Reasoning*, 106 Harv. L. Rev. 741 (1993) .........................................33

1

## AMICI CURIAE STATEMENT OF INTEREST

Amici law professors teach and/or write on the Second Amendment: Randy Barnett (Georgetown), Robert Cottrol (George Washington), Lee Francis (Mississippi College), Donald Kilmer (Lincoln), Joyce Malcolm (George Mason, emerita), George Mocsary (Wyoming), Joseph Muha (Akron), Joseph Olson (Mitchell Hamline, emeritus), Glenn Reynolds (Tennessee), and Gregory Wallace (Campbell).[1]

Cited by this Court in *Heller* and *McDonald*, and oft-cited by lower courts, these professors include authors of the first law school textbook on the Second Amendment, and many other books and law review articles on the subject.[2]

The Second Amendment Law Center ("2ALC") is a nonprofit corporation in Henderson, Nevada. The Center defends the individual rights to keep and bear arms as envisioned by the Founders. 2ALC also educates the public about the social utility of firearm ownership and provides accurate historical, criminological, and technical information to policymakers, judges, and the public.

Founded in 1985 on the eternal truths of the Declaration of Independence, the Independence Institute is a 501(c)(3) public policy research organization in

---

[1] No counsel for any party authored the brief in any part. Only amici funded its preparation and submission.

[2] *See* https://davekopel.org/Briefs/SCt/Rahimi/Professor Biographies.pdf.

2

Denver, Colorado. The briefs and scholarship of Research Director David Kopel have been cited in seven opinions of this Court, including *Bruen*, *McDonald* (under the name of lead amicus Int'l Law Enforcement Educators & Trainers Association (ILEETA)), and *Heller* (same). Kopel has also been cited in 89 opinions of lower courts. The Institute's Senior Fellow in Constitutional Studies, law professor Robert Natelson, has been cited in eleven opinions by Justices of this Court.

## SUMMARY OF ARGUMENT

This brief addresses "who" may be deprived of the right to arms. Some lower courts have had difficulty discerning lessons to draw from historical laws disarming various groups.

Constitutional enactments about the right to arms have added specificity to the right. When a constitutional enactment forbids depriving a particular group of the right to arms, the prior laws targeting that group are repudiated as legitimate precedents from which modern gun control analogies may be drawn.

The 1689 English Bill of Rights, which is part of the British Constitution and was applicable in America, repudiated deprivation of arms rights because of peaceful political disagreement or because of adherence to a Protestant denomination that was not the established Church of England. The 1689 enactment allowed some restrictions based on economic or social class, and did not protect non-Protestants.

3

The 1788 United States Constitution rejected arms restrictions for persons whose religious scruples did not allow them to "swear" an "oath."

The 1791 Second Amendment rejected arms rights limitations based on religion or class/income. Therefore, the short-lived 1756 anti-Catholic laws in two colonies have no validity as post-1791 precedents for limitations on Second Amendment rights.

The 1865 Thirteenth Amendment abolished all the "badges and incidents" of slavery. Being disarmed is an incident of being enslaved. Hence, the Thirteenth Amendment obliterated the precedential value of earlier statutes forbidding slaves to have arms or allowing possession only with a discretionary license.

All four clauses of section one of the 1868 Fourteenth Amendment finished the work. Prior statutes imposing arms restrictions on free people of color were thereafter negated as precedents for arms restrictions.

During the American Revolution, some "Loyalists" still considered themselves "subjects of the King of Great Britain," and not "the people of the United States." Textually, Second Amendment rights inhere only in "the people" of the United States.

Similarly, when the Constitution was ratified, Indians were members of foreign nations. Their relations with the United States were governed by treaties ratified by the Senate. Later, Indians became citizens of the United States, with the right to keep and bear arms. The colonial and Early Republic arms laws about

4

Indians who were members of other nations are valid precedents today for arms laws applying to citizens of foreign nations.

The precedents about members of foreign nations are not useful here, because Mr. Rahimi is a U.S. citizen, and hence one of the people of the United States.

However, as accurately catalogued in the Solicitor General's brief, there is ample original meaning precedent for limiting an individual's arms rights based on a judicial finding that the person poses a danger to others. Therefore, state statutes addressing the same subject as 18 U.S.C. §922(g)(8)(C)(i) can comply with the Second Amendment.

While subsection (C)(i) requires finding of "a credible threat," subsection (C)(ii) does not, and therefore is an infringement. The problem could be solved by changing a single word between §922(g)(8)(C)(i) and (ii): "or" to "and." Making (C)(i) and (C)(ii) conjunctive instead of disjunctive would remedy the infringement in (C)(ii).

### ARGUMENT

**I.   The original public meaning of the Second Amendment is not infringed by laws to take arms from persons proven to be dangerous to others.**

According to Petitioner, this Court's statements about "law-abiding, responsible citizens" mean that a person's arms rights may be restricted "if his

5

possession of a firearm would pose a danger of harm to himself or others." PetBr27. Petitioner's conclusion regarding "harm" "to others" is supported by citations to common law and statutory offenses against carrying arms to terrify the public, and to surety statutes for persons who carried arms in a manner threatening to breach the peace. PetBr23-24. Additional support comes from cited commentary from 1840 through 1868. *Id.* at 19-21.

Regarding persons who pose a danger to others, amici agree that such laws do not infringe the Second Amendment. Amici will address the "who" of disarmament, which is part of the "why." This brief takes no position on "how"—that is, whether the §922(g)(8) ban on firearms possession is analogous to the particular restrictions that historic laws imposed on dangerous people.

Petitioner's emphasis on danger is a welcome departure from positions in other cases involving as-applied challenges by individuals who are plainly not dangerous. *See*, *e.g.*, *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 98 (3d Cir. 2023) (en banc) (in 1995 paid $2,458 restitution for food stamp fraud); *United States v. Daniels*, 77 F.4th 337, 348 (5th Cir. 2023) (no evidence that marijuana user carried or shot firearms while intoxicated).

While Petitioner's point about dangerousness is correct, some of Petitioner's cites are inapt, including the 1662 Militia Act of "wicked" King Charles II. PetBr14 (citing 14 Car. 2 ch. 3, §13). In the American

6

view, the right to arms "was trampled under foot by Charles I. and his two wicked sons and successors." *District of Columbia v. Heller*, 554 U.S. 570, 613 (2008) (quoting *Nunn v. State*, 1 Ga. 243, 251 (1846)). Petitioner offers no evidence that the 1662 statute "was acted upon or accepted in the colonies." *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2136 (2022) (quoting *Dimick v. Schiedt*, 293 U.S. 474, 477 (1935)).

Petitioner misunderstands the parliamentary debate following the 1780 Gordon Riots in London. No one denied the propriety of confiscating firearms from rioters. PetBr15-16. The debate involved General Amherst's alleged order, which he denied, to take guns carried by defensive neighborhood patrols who continued after the riot had been suppressed. Nicholas Johnson, David Kopel, George Mocsary, Gregory Wallace, & Donald Kilmer, FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS AND POLICY 155-56 (3d ed. 2022) ("Johnson").

Petitioner's citation to California's 1855 law about "Greasers" is unpersuasive. PetBr26 n.21. "Greaser" was "applied contemptuously" to Mexican-Americans, some of whom greased wagon axles or animal hides. *Greaser*, OXFORD ENGLISH DICT. defn. 2.a (Online, Mar. 2023). The precedential value of the Greaser Act was erased by the Fourteenth Amendment, as explained below.

Likewise questionable is Petitioner's citation to an 1874 *New York Times* article about "drunken loafers."

7

PetBr21. This citation, like others to the late nine-
teenth century, is at most marginally relevant. *Bruen*
at 2137. Petitioner's citations to twentieth century
laws tell us nothing about the original meaning of the
Second Amendment. *Id.* at 2154 n.28.

### A. While Petitioner's amici rely on invidi-ous discrimination, constitutional en-actments repudiate such discrimination for arms rights.

Petitioner's brief does not rely on slave codes, in
contrast to Petitioner's briefing below. *See United
States v. Rahimi*, 61 F.4th 443, 456 (5th Cir. 2023) (not-
ing government citation of slave laws).

Several of Petitioner's amici do try to convert long-
rejected invidious discrimination into modern consti-
tutional precedent. *See* Amicus Briefs of Second
Amendment Law Scholars 14-15; Professors of History
and Law 9-10; 97Percent 5-6; National League of Cities
15; Public-Health Researchers and Lawyers 3, 14-15;
Texas Advocacy Project 5.

These briefs overlook the arms-related constitu-
tional enactments repudiating the invidious laws. The
right to arms is governed by constitutional enact-
ments, and not by abuses the enactments were de-
signed to stop.

As legal historian Sir Henry Maine observed, "the
movement of the progressive societies has hitherto
been a movement *from Status to Contract*." Henry

8

Maine, ANCIENT LAW 182 (1861). Similarly, the progress of the right to arms has been constitutional enactments to repudiate unjust exclusions.

### 1.  The 1689 English Bill of Rights

In the American legal tradition, the progress began with the 1689 English Bill of Rights. Previously, the "wicked" Stuart monarchs had attempted to disarm political dissidents, and to disarm persons who did not adhere to the established Church of England. Johnson at 126-39.

The English Bill of Rights declared: "That the Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by Law." *Heller* at 593 (citing 1 Wm. & Mary ch. 2, §7).[3]

As a result, the English government stopped enforcing an abusive portion of the 1662 Militia Act. The act's text ordered confiscation of arms from the "dangerous" or the "disaffected"; after 1689 the act was only enforced against the "dangerous." *See* PetBr14 (citing sources). Peaceful political disagreement was no longer grounds for arms confiscation.[4]

_____

[3] The English Bill of Rights is among several documents, such as Magna Carta (1215), that, along with various unwritten traditions, comprise the British Constitution.

[4] At the time, "disaffected" could include being nonviolently "dissatisfied." *Disaffected*, OXFORD ENGLISH DICT.

9

The protection of the rights of all Protestants, regardless of denomination, did not apply to England's small Catholic minority.[5] A statute enacted the same year as the Bill of Rights allowed arms for Catholics who swore a loyalty oath denying papal authority in England; or, for those who would not swear, if a Justice of the Peace granted them a license. 1 Wm. & Mary ch. 15 (1689).

The language "suitable to their Conditions" could be interpreted to allow class or economic discrimination. Thus, an 1870 English statute required persons carrying handguns off their property to purchase a nondiscretionary annual 10-shilling tax stamp at the post office. 33 & 34 Vict. ch. 57 (1870). The tax stamp, equivalent to about $84 today, burdened poor people.

American colonial charters guaranteed that Americans would have all the rights of Englishmen, and they also guaranteed a written right that the people in England did not have: the perpetual right to import arms.[6]

---

[5] The English Bill of Rights was not initially considered to apply in Ireland or Scotland, which had their own parliaments. In Ireland, firearms were allowed only with discretionary licenses, rarely issued to either Catholics or Protestants. Johnson at 2159-62 (supplemental online chapter, http://firearmsregulation.org/www/FRRP3d_CH22.pdf ).

[6] *See* FEDERAL AND STATE CONSTITUTIONS COLONIAL CHARTERS, AND OTHER ORGANIC LAWS OF THE STATES, TERRITORIES, AND COLONIES 3783, 3786-88 (Thorpe ed., 1909) ("Southern Colony"); 3 *id.* at 1834-35, 1839 ("Northern Colony"). Americans' rights of Englishmen were reiterated in subsequent colonial charters. *See* 1 *id.* at 533 (Connecticut); 2 *id.* at 773 (Georgia); 3 *id.* at

10

In the American colonies, no enactments discriminated against keeping or bearing arms on the basis of income. Religious discrimination for arms was rare but not nonexistent.

In 1637, long before the 1689 Bill of Rights protected arms rights for all Protestants, theocratic Massachusetts Bay Colony issued an ex parte decree "with no due process," disarming 75 Antinomian followers of Anne Hutchinson.[7]

In 1643 Virginia, the royal governor imprisoned, disarmed, and banished 118 recent Puritan immigrants; they moved to Maryland. *See* Charles Campbell, HISTORY OF THE COLONY AND ANCIENT DOMINION OF VIRGINIA 211-12 (1860).

After an attempted assassination of King William III in England in 1696, the royal governor of New York confiscated the firearms of all ten Catholic men in the colony.[8]

---

1681 (Maryland); 3 *id.* at 1857 (Massachusetts Bay); 5 *id.* at 2747 (Carolina, later divided into North and South Carolina); 6 *id.* at 3220 (Rhode Island).

[7] Marilyn Westerkamp, THE PASSION OF ANNE HUTCHINSON 51 (2021); Joseph Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 263 (2020). Antinomians believe that grace liberates Christians from obedience to the Mosaic Law.

[8] Shona Johnston, Papists in a Protestant World: The Catholic Anglo-Atlantic in the Seventeenth Century 219-20 (2011) (Ph.D. dissertation, Georgetown University). https://repository.library. georgetown.edu/bitstream/handle/10822/553125/johnstonShona.pdf ? sequence=1&isAllowed=y.

11

At the beginning of French & Indian War in 1756, the royal governor of New Jersey, in defiance of the rights of "the Subjects which are Protestants," confiscated firearms from Moravians, a Protestant pacifist denomination who owned hunting guns; the governor called the Moravians "snakes" and likely wanted their guns for the colony's militia. Johnson at 198.

Also in 1756, Pennsylvania confiscated "papist" arms to distribute to the militia. 5 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 627 (Ray ed., 1898). Virginia did the same. If a person would not sign an oath, his arms would be taken, except those "necessary" for "the defence of his house or person." William Hening, 7 THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA 35 (1823).[9]

---

[9] Maryland in 1756 is sometimes said to have done the same, based on a cite to 52 ARCHIVES OF MARYLAND 450 (Pleasants ed., 1935). However, that source shows the Lower House, on May 22, 1756, passing a militia bill with an anti-Catholic provision. *Id.* at 454 (reprinting 48 Lower House Journal 301). Both houses adjourned the same day, without the Upper House acting on the bill. The Governor's speech to the legislature that afternoon expressed his "Surprize" that no militia bill had been enacted. *Id.* at 297-98 (reprinting 35 Upper House Journal 115), 474-75 (same message, 48 L.H.J. 217). In the next legislative session, the Lower House twice rejected a militia bill. *Id.* at 640-41 (Oct. 7, 1756; 48 L.H.J. 359). The session laws tables for the Feb.-May and Sept.-Oct. 1756 legislative sessions show that no militia or Catholic arms bill was enacted. 1756 Md. L. 34 (Feb. sess.); 1756 Md. L. 7 (Sept. sess.).

12

### 2.  The 1791 Second Amendment

According to James Madison's notes for his speech introducing the Bill of Rights in the United States House of Representatives, the English Bill of Rights had numerous defects. Among them was the limitation of "arms to Protestts." James Madison, Notes for Speech on Constitutional Amendments, June 8, 1789, in 12 MADISON PAPERS 193-94 (Hobson & Rutland eds., 1979).[10]

Even if the First Amendment's Free Exercise Clause had never been enacted, the Second Amendment by its own force forbids religious discrimination in arms rights. For example, a post-9/11 law to disarm Muslim citizens of the United States would have been a Second Amendment infringement.

Madison also chose to omit the 1689 English text about "Conditions." In the decades before and after the Second Amendment, American laws did not restrict arms rights based on wealth. As the Tennessee Supreme Court stated regarding the State Constitution, the English Bill of Rights "Conditions" were "abrogated"; "all free citizens" have the right, "without any

---

The error confusing Lower House passage with actual enactment is made, *inter alia*, in the Johnson textbook at 197, and is corrected in its 2023 Supplement at 101.

[10]  The speech as summarized in Annals of Congress does not include explication about the right to arms. The "Annals of Congress were not a transcript, but were assembled years later from newspaper reports of the debates." David Hardy, *Ducking the Bullet:* District of Columbia v. Heller *and the Stevens Dissent*, 2010 Cardozo L. Rev. de novo 61, 80 n.109.

13

qualification whatever, as to their kind and nature." *Simpson v. State*, 13 Tenn. 356, 360 (1833).

It is true that in the late nineteenth century some Jim Crow states enacted laws of overt economic discrimination, with a subtext of discrimination against freedmen and poor whites. Tennessee and Arkansas outlawed sale of handguns other than the Army and Navy types. *See State v. Burgoyne*, 75 Tenn. 173 (1881); *Dabbs v. State*, 39 Ark. 353 (1885).

The military-style handguns were the best-made, most expensive, largest, highest-capacity, and most powerful. Many former Confederate officers already owned them. Poor people of any race could not necessarily afford such an excellent arm.

After incidents in which blacks used repeating rifles to deter lynch mobs, Florida in 1893 imposed a $100 bond (over $3,000 today) for a license to "carry around with him on his person and in his manual possession" a "Winchester rifle or other repeating rifle." 1893 Fla. L. 71, ch. 4147; Johnson at 522-23. The law was extended to handguns in 1901. 1901 Fla. L. 57, ch. 4928. Florida Supreme Court Justice Rivers Buford had been a State Representative in the legislative session that passed the handgun provision. Later, in a 1941 opinion, he disapprovingly pointed out that the license law violated the Second Amendment and its Florida analogue, and "was never intended to apply to the white population and in practice has never been so applied," for "it has been generally conceded to be in contravention of the Constitution and non-enforceable

14

if contested." *Watson v. Stone*, 148 Fla. 516, 524 (1941) (Buford, J., concurring).[11]

The few examples of economic discrimination from the late nineteenth century do not overcome the textual removal of English "Conditions" in the American Bill of Rights. *Bruen* properly noted the illegality of "exorbitant" fees for carry permits. *Bruen* at 2138 n.9.

### 3. The 1865 Thirteenth Amendment

The original Constitution did not attempt to abolish slavery; instead, it authorized Congress to forbid the "Importation" of slaves starting in 1808. U.S. Const. art. I, §9. As the Founders understood, disarmament is a necessary condition for slavery. They defined "slavery" broadly; to them, "slavery" included chattel slavery (as practiced against African and Indian captives) and also political systems based on arbitrary will rather than consent. Either way, to be disarmed is to subject to the arbitrary will of another—to be enslaved or enslaveable. If slaves had a right to arms, they would not be slaves for long.[12]

---

[11] The *Watson* majority applied the rule of lenity to possession in an automobile glove compartment. Drivers "should not be branded as criminals in their effort of self preservation and protection, but should be recognized and accorded the full rights of free and independent American citizens." *Id.* at 703.

[12] Some states forbade slave possession of arms, while others left the choice to the owner or a local official's discretion. *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 845-46 (2010) (Thomas, J., concurring).

15

The venerated English martyr of liberty Algernon Sidney wrote, "he is a fool who knows not that swords were given to men, that none might be slaves, but such as know not how to use them." Algernon Sidney, DISCOURSES CONCERNING GOVERNMENT ch. 2, §4 (West ed., 1996) (1698). Thomas Jefferson called Sidney, Aristotle, Cicero, and John Locke the four major sources of the American consensus on rights and liberty, which Jefferson distilled into the Declaration of Independence. Letter from Thomas Jefferson to Henry Lee (May 8, 1825), in 16 THE WRITINGS OF THOMAS JEFFERSON 117-19 (Lipscomb ed., 1903).

When King George III in 1768 put Boston under military occupation, the city's government urged Bostonians to arm themselves. Samuel Adams agreed: The English Bill of Rights had been enacted because of the wicked Stuarts, "bigoted to the greatest degree to the doctrines of *slavery* and regardless of the *natural, inherent, divinely hereditary* and *indefeasible* rights of their subjects." Samuel Adams (E.A.), BOSTON GAZ., Feb. 27, 1769, in 1 THE WRITINGS OF SAMUEL ADAMS 317-18 (Cushing ed., 1904). Pursuant to the 1689 Bill of Rights, as expounded by Blackstone, there is a right to arms "at any time; but more especially" for "self preservation against the *violence of oppression.*" *Id.*

Patrick Henry, too, equated disarmament with slavery, as in his famous speech:

> But when shall we be stronger? . . . Will it be when we are totally disarmed, and when a

British guard shall be stationed in every house? . . .

. . . There is no retreat but in submission and slavery! Our chains are forged! Their clanking may be heard on the plains of Boston!

. . . Is life so dear, or peace so sweet, as to be purchased at the price of chains and slavery? Forbid it, Almighty God! I know not what course others may take; but as for me, give me liberty or give me death!

Patrick Henry, *The War Inevitable*, Speech at the Second Revolutionary Convention of Virginia, Mar. 23, 1775, in William Wirt, SKETCHES OF THE LIFE AND CHARACTER OF PATRICK HENRY 122-23 (1817). In the same spirit, the Declaration of Independence affirmed that Americans are "with one mind, resolved to die freemen rather than live slaves." Declaration of Independence (U.S. 1776).

American State Constitutions and State Conventions declared, "The doctrine of non-resistance against arbitrary power and oppression is absurd, slavish, and destructive of the good and happiness of mankind." N.H. Const., Bill of Rights, art. X; Tenn. Const. of 1796, art. 11, §2; Resolution of Virginia's Proposed Amendments, in 3 DEBATES ON THE ADOPTION OF THE FEDERAL CONSTITUTION 657 (Elliot ed., 1836) (preamble); Resolution of North Carolina's Proposed Amendments, 4 ELLIOT at 243 (Declaration of Rights).

17

The American Revolution's *Novus ordo seclorum* produced changes not foreseen when the Revolution began. If "all Men are created equal," then slavery is invalid. Starting in the 1780s, the Declaration of Independence became a moral center of abolitionism in the United States. *See* Alexander Tsesis, FOR LIBERTY AND EQUALITY: THE LIFE AND TIMES OF THE DECLARATION OF INDEPENDENCE 44, 50-55, 61-62, 104-12, 116, 119, 126, 136-43, 182 (2012).

Abolitionist constitutionalism relied in part on the Second Amendment. According to Joel Tiffany, reporter for the N.Y. Court of Appeals, and author of legal treatises:

> Here is another of the immunities of a citizen of the United States, which is guaranteed by the supreme, organic law of the land . . . [It] is accorded to every subject for the purpose of *protecting and defending himself*, if need be, in the enjoyment of his absolute rights to life, liberty and property. And this guaranty is to all without any exception; for there is none, either expressed or implied . . . It is hardly necessary to remark that this guaranty is absolutely inconsistent with permitting a portion of our citizens to be enslaved. The colored citizen, under our constitution, has now as full and perfect a right to keep and bear arms as any other; and no State law, or State regulation has authority to deprive him of that right.

> But there is another thing implied in this guaranty; and that is *the right of self defence*. For the right to keep and bear arms, also

18

> implies the right to use them if necessary in
> self defence; without this right to use the
> guaranty would have hardly been worth the
> paper it consumed.

Joel Tiffany, A TREATISE ON THE UNCONSTITUTIONALITY OF AMERICAN SLAVERY 117 (1850). Or as abolitionist Lysander Spooner wrote in 1845, the Second Amendment "obviously recognizes the natural right of all men 'to keep and bear arms' for their personal defence; and prohibits both Congress and the State governments from infringing the right of 'the people'—that is, of *any* of the people,—to do so." Lysander Spooner, THE UNCONSTITUTIONALITY OF SLAVERY 116 (1845).

Among the "incidents" of slavery was, "He is not allowed to keep or carry fire-arms." *Neal v. Farmer*, 14 Ga. 185, 202-03 (1853). Therefore, when the Thirteenth Amendment declared "Neither slavery nor involuntary servitude . . . shall exist within the United States," the "badges and incidents" of slavery were likewise outlawed. U.S. Const. amend. XIII, §1; *Civil Rights Cases*, 103 U.S. 3, 20-21 (1883).

Following the ratification of the Amendment, Horace Greeley, the newspaper editor, abolitionist, and (later) 1872 presidential nominee of the Democratic and Liberal Republican parties, argued in a speech:

> [T]he moment slavery had passed away, all
> possible pretexts for disarming Southern
> blacks passed away with it. Our Federal Con-
> stitution gives the right to the people every-
> where to keep and bear arms and every law
> whereby any State legislature undertakes to

19

> contravene this, being in conflict with the
> Constitution of the United States, had no
> longer any legal force.

James Parton, THE LIFE OF HORACE GREELEY 535-36
(1869).

Ever since 1865, the arms provisions of the slave
codes have been analogues for what is forbidden by our
constitutional right to arms.

### 4. The 1868 Fourteenth Amendment

The Thirteenth Amendment notwithstanding,
many former slave states attempted to keep freedmen
in de facto servitude, including by thwarting their Sec-
ond Amendment rights. *McDonald* at 771-76 (opinion
of the Court), 826-35, 846-50 (Thomas, J., concurring).

> Black veterans returning home were consid-
> ered dangerous, and disarming them was a
> priority for the white supremacists of the de-
> feated Confederacy . . . There is an ironic sim-
> ilarity between the claims made by southern
> whites then and the argument made by gun
> control proponents today. Sheriffs and white
> posses raided black homes to seize "illegal"
> guns and declared such seizures were not in-
> fringements of blacks' Second Amendment
> right to possess guns as part of a militia.

Charles Cobb, "THIS NONVIOLENT STUFF'LL GET YOU
KILLED": HOW GUNS MADE THE CIVIL RIGHTS MOVEMENT
POSSIBLE 44 (2014).

20

As Frederick Douglass explained, "the Legislatures of the South can take from him the right to keep and bear arms, as they can—they would not allow a negro to walk with a cane where I came from . . . " *In What New Skin Will the Old Snake Come Forth?*, in 4 THE FREDERICK DOUGLASS PAPERS 79, 83-84 (Blassingame & McKivigan eds., 1991) (May 10, 1865). "Notwithstanding the provision in the Constitution of the United States, that the right to keep and bear arms shall not be abridged, the black man has never had the right either to keep or bear arms." *Id*. at 84. Absent a constitutional amendment to enforce that right against the States, "the work of the Abolitionists is not finished." *Id*. "Keep no man from the ballot box or jury box or the cartridge box, because of his color." *Id.* at 158 (Feb. 7, 1867).

Before the Civil War, slave states had also targeted free people of color. For example, an 1840 North Carolina statute forbade any "free negro, mulatto, or free person of color" to possess or carry arms without a license. The state supreme court admitted the statute would be unconstitutional if applied to whites; however, "free people of color have been among us, as a separate and distinct class, requiring, from necessity, in many cases, separate and distinct legislation." *State v. Newsom*, 27 N.C. 250, 252 (1844).

Such reasoning was multiply forbidden by section 1 of the Fourteenth Amendment. First, "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." Thus, the

21

Amendment overturned *Dred Scott*'s theory that free people of color are not American citizens, and hence could be forbidden "to keep and carry arms wherever they went." *Scott v. Sandford*, 60 U.S. 393, 417 (1857), *superseded by* U.S. Const. amend. XIV, §1.

Second, "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." The language was specifically intended to protect Second Amendment rights for all citizens, not only militiamen. *McDonald* at 847-50 (Thomas, J., concurring).

Third, "nor shall any State deprive any person of life, liberty, or property, without due process of law." The clause forbids certain government actions, including bans on keeping and bearing arms, because some statutes are necessarily *not* "law" in the American sense, namely "ordered liberty." *Id.* at 776-78 (plurality op.). *Cf. Calder v. Bull*, 3 U.S. 386, 388 (1798) (Chase, J., seriatim op.) ("An ACT of the Legislature (for I cannot call it a law) contrary to the great first principles of the social compact, cannot be considered a rightful exercise of legislative authority."); Declaration of Independence ("pretended legislation," "pretended offenses").

And fourth, "nor deny to any person within its jurisdiction the equal protection of the law." The Equal Protection Clause recognizes a duty of state governments to protect the rights of all "persons" by effectively enforcing its laws without discrimination. Because of the Clause, after 1868, legislatures intent

22

on racial discrimination in arms laws wrote those laws without specific reference to race.

"We the People of the United States" govern most supremely by constitutional enactment. By such enactments, we the people have abolished many infringements of the right to keep and bear arms. Those infringements today are analogues for types of laws that the constitutional right to arms forbids, not the types of laws that it allows.

### 5. Indians

Some amici, the United States in some lower courts, and some lower courts have pointed to colonial period or Early Republic laws against arms sales to Indians. These are irrelevant to the case at bar, because they involved the citizens of other nations.

The Constitution created by "We the People of the United States" did not purport to establish a system of government and rights for the people of France or of the Cherokee nation. Instead, Congress was simply given power "To regulate Commerce with foreign nations . . . and with the Indian Tribes." U.S. Const. art. I, §8.

When the United States was in friendly relations with a foreign nation or an Indian tribe, their agreements were treaties ratified by the Senate. To the extent that Congress chose, it could regulate trade with non-American nations, whether Indian or overseas. Regulation of trade with foreigners does not infringe

23

the Second Amendment rights of foreigners, because foreigners are not "the people." For example, today a Russian cannot claim that his Second Amendment rights are infringed because federal regulations prevent him from buying an American-made gun. 15 C.F.R. §746.8.

In the years following 1787, the practical sovereignty of the Indian tribes was diminished. An 1871 statute declared that henceforth "No Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty . . . " 16 Stat. 544, 566 (codified at 25 U.S.C. §71).

Laws recognized American citizenship of more and more Indians, with citizenship for all in 1924. Indian Citizenship Act, 8 U.S.C. §1401(b). To the extent laws have infringed the arms rights of citizen Indians, they were unconstitutional *ab initio*.[13]

Historic laws regarding arms restrictions for noncitizens are relevant today. For example, foreigners

---

[13] In the colonial period and thereafter, some Indians chose to live in American society rather than in tribal nations. Indians who did so were "taxed" and were counted for congressional apportionment; Indians who lived in tribal nations were "not taxed" and not represented in Congress. U.S. Const. art., I §2; amend. XIV, §2. The Fourteenth Amendment forbids state governments from arms discrimination against citizen Indians, but the Second Amendment has not been deemed enforceable against tribal governments. *See* Angela Riley, *Indians and Guns*, 100 Geo. L.J. 1675, 1721-25 (2012).

24

visiting the U.S. on a tourist visa may only possess fire-arms if "admitted to the United States for lawful hunt-ing or sporting purposes or is in possession of a hunting license or permit lawfully issued in the United States." 18 U.S.C. §922(g)(5)(B), (y)(2)(A). The statute does not infringe the Second Amendment, because for-eign tourists are not included in "the people" of the United States.

Citizenship analogies also inform analysis of the firearms prohibition for a person, "who, having been a citizen of the United States, has renounced his citizen-ship." 18 U.S.C. §922(g)(7).

Citizenship analogies are not relevant to the *Rahimi* case, because Mr. Rahimi is a citizen of the United States. That he is dangerous and unvirtuous does not make him a noncitizen, and therefore he is one of "the people."

### 6. Disloyalty in wartime

During the American Revolution some state laws took arms from people who refused to swear loyalty to the United States. *United States v. Jackso*n, 2023 WL 5605618, *4 (8th Cir., Aug. 30, 2023) (Stras, J., dissent-ing from denial of rehearing en banc). In wartime, dis-armament is permissible for enemy combatants and for persons who have shown inclination to aid the en-emy.

For example, after the German surrender in World War II in May 1945, but before the Japanese surrender

25

in September, some Germans in Japanese-occupied China continued to aid the Japanese army. This Court rejected the claim that the Germans had a right to be tried by a civil court rather than a military tribunal. According to Justice Jackson's opinion for the Court, granting the Germans Fifth Amendment rights would mean that during "military occupation" of territories formerly held by the Axis, "irreconcilable enemy elements, guerrilla fighters, and 'were-wolves' could require the American Judiciary to assure them freedoms of [the] . . . right to bear arms as in the Second" Amendment. *Johnson v. Eisentrager*, 339 U.S. 763, 784 (1950); *see also* Attorney General oral argument, *Ex Parte Milligan*, 71 U.S. 2, 20 (1866) (Second Amendment did not "hinder the President from disarming insurrectionists, rebels, and traitors in arms while he was carrying on war against them.").

During the American War of Independence, the anti-independence "Loyalists" rejected being "the people of the United States." They fought to remain "subjects of the King of Great Britain." The Second Amendment is not infringed by wartime disarmament of individuals who choose to exclude themselves from "the people."

In the revolutionary period, some Americans bearing true faith and allegiance to the United States were unwilling to "swear" an "oath." *Range*, 69 F.4th at 126-27 (Krause, J., dissenting). Jesus had said "Swear not at all." *Matthew* 5:34. The wrongful disarmament of religiously scrupulous non-swearing citizens was repudiated by the Constitution. The President-elect "shall

26

take the following Oath or Affirmation:—'I do solemnly swear (or affirm) . . . '" U.S. Const. art. II, §1. Likewise, all federal and state officers "shall be bound by Oath or Affirmation, to support this Constitution." U.S. Const. art. VI.

Because the Commander in Chief and other officials may choose affirmation instead of oath, citizens with similar scruples may not be disarmed.

### 7.  Conclusion

The analogical validity of old laws does not depend on modern judges' moral analysis. Instead, constitutional enactments control. Although some old gun controls were the fruit of poisonous trees, we the people by our constitutional enactments have removed those trees, root and branch. The enactments of 1689, 1788, 1791, 1865, and 1868 ended all validity of bigoted gun control laws. Today, those laws are analogues for types of gun control that are forbidden.

In contrast, historic gun control laws based on citizenship remain proper analogues for modern laws.

### B.  Synthesis of disarmament precedents.

The disarmament precedents that have *not* been repudiated by constitutional enactments have two broad categories. The first is a group standard and the second an individual one. The existence of two standards is not surprising, because the Second Amendment is about sometimes bearing arms in a group (such as

27

the militia, a sheriff's posse comitatus, or a hunting party) and sometimes individually (such as for defense in one's automobile). After London's 1780 Gordon Riots, the Recorder of London—the city attorney—affirmed that the defensive neighborhood patrols were an exercise of the right to arms: "that right, which every Protestant most unquestionably possesses, *individually*, may, and in many cases *must*, be exercised collectively." William Blizard, DESULTORY REFLECTIONS ON POLICE 59-60 (1785). Just as the right is necessarily sometimes exercised collectively and sometimes individually, the limitations of the right will sometimes be collective and sometimes individual.

Collectively, an absence of Second Amendment rights arises from not being among "the people."

Individually, Second Amendment rights may be restricted based on specific behavior demonstrating danger to others.

The dangerousness category draws no support from old laws about Catholics, free people of color, poor people, and the like. Although legislatures, kings, or other officials did consider these groups to be dangerous, the people, through constitutional enactments, have stricken such laws from being valid precedents for limiting our right to arms. *Accord* ACLU br. 12 n.4 (racist cites not needed to uphold statutes against individuals judicially found to pose "a violent threat").

28

### C. Applying "law-abiding responsible citizens."

As Petitioner states, disarmament of persons who are dangerous to others is consistent with this Court's language about "law-abiding citizens." The words are not meant to produce absurd results. A city council could not prohibit firearms possession by someone convicted of overtime parking, even if the council made the crime punishable by up to three years in jail and even if the person were convicted a hundred times.

Likewise, "law-abiding citizens" should not be construed as implicitly over-ruling *United States v. Verdugo-Urquidez*, which stated that "the people" safeguarded by the Bill of Rights, including the Second Amendment, includes persons who have "developed substantial connections with this country." 494 U.S. 259, 271 (1990). The category surely includes noncitizens who have been granted lawful permanent residency. *Accord* 18 U.S.C. §922(5)(B) (no prohibition for persons admitted under immigrant visas).

## II.   The defects of section 922(g)(8).

The decision below should be affirmed because a single word in 922(g)(8) makes it facially unconstitutional. The statute bans firearms possession based on two different types of court orders:

> (C)(i)   includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or

29

(ii)   by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury;

Because (C)(i) requires a judicial finding of dangerousness, it does not infringe the Second Amendment. Subsection (C)(ii) does not require such a finding and is an infringement. Judicial orders that acrimonious domestic parties not do something illegal in the future is not equivalent to a judicial finding that there is "a credible threat" of illegal behavior. Congress could easily fix the problem by changing the "or" at the end of (C)(i) to "and."[14] Alternatively, subsection (C)(ii) could be severed.

Amicus California Legislative Women's Caucus ("CLWC") attempts to rescue (C)(ii), saying it is used when "the subject of the order has a history of threats of violence or there is other credible evidence that violence may occur." CLWC 22-23. If (C)(ii) were so worded, it would be similar to (C)(i) and not an infringement.

Because (C)(ii) is so open-ended, it encompasses mutual protective orders that infringe the Second Amendment by disarming victims. Unlike federal law, California has specific protections against

---

[14] That §922(g)(8) was drafted without Second Amendment scruples is unsurprising. The sponsor, well-respected Sen. John Chafee, had previously introduced legislation to confiscate all handguns. S. 2913, 102d Cong. (1992).

30

inappropriate issuance of mutual orders. CLWC 24. Such orders are also prohibited in Illinois. Legal Aid Chicago br. 27.[15]

The Second Amendment aside, §922(g)(8) is still constitutionally dubious. The connection to congressional power "To regulate Commerce . . . among the several States" is even weaker than the "Gun-Free School Zones" statute previously held unconstitutional. *United States v. Lopez*, 514 U.S. 549 (1995); U.S. Const. art. I, §8. Indeed, the statute in *Lopez* exempted the home and other private property (then-18 U.S.C. §922(q)(2)(B)(i)), whereas (g)(8) does not.

Some of the §922(g) prohibitions are well-grounded in the Interstate Commerce Clause: "to ship

---

[15] However, Legal Aid is untroubled by §922(g)(8)'s lack of safeguards against improper mutual orders. The brief quotes an article that a survivor's possession of a defensive firearm "doubles the risk of firearm homicide by an abusive partner." *Id.* at 21. The cited article contains no such words. The cited article found, "Addition of the relationship variables resulted in victims' sole access to a firearm no longer being statistically significant and substantially reduced the effects of abuser's drug use." Jacquelyn Campbell et al., *Risk Factors for Femicide in Abusive Relationships*, 93 Am. J. Pub. Health 1089, 1090 (2003).

The Houston Area Women's Center quotes a study that "[W]omen with firearm access have a higher risk for homicide victimization." Br. 7, quoting Andrew Anglemyer et al., *The Accessibility of Firearms and Risk for Suicide and Homicide Victimization among Household Members: A Systematic Review and Meta–analysis*, 160 Annals of Internal Med. 101, 107 (2014). Unlike the Campbell article, the statement does not differentiate whether the abuser has access to the same firearm. Indeed, the article suggests that most fatalities came from "an interpersonal dispute within the household or other domestic violence." *Id.*

31

or transport in interstate or foreign commerce." Another prohibition, "to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce," has a distant connection to interstate commerce, by involving a property transfer.

The prohibition "possess in or affecting commerce"—as read by Petitioner to encompass mere possession of a gun that once crossed a state line—is far disconnected from the power "To regulate Commerce . . . among the several States." *See* David Engdahl, *The Necessary and Proper Clause as an Intrinsic Restraint on Federal Lawmaking Power*, 22 Harv. J.L. & Pub. Pol'y 107, 120 (1998) (criticizing "the 'herpes' theory" that a single crossing of state lines makes an item forever subject to the interstate commerce power); David Kopel & Glenn Reynolds, *Taking Federalism Seriously: Lopez and the Partial Birth Abortion Ban Act*, 30 Conn. L. Rev. 59 (1997) (some bans on arms possession, like bans on particular abortion procedures within a state, exceed the legitimate scope of the interstate commerce power).

When Congress acts beyond its enumerated powers, federal-state comity is injured. Federal courts do not exist to adjudicate state domestic relations cases. "Since the birth of the union, it is the individual states that have held the power to enact laws for the good and welfare of their citizens, including those laws providing for protective orders." Tarrant County Crim. Dist. Atty. br. 24 (capitalization changed).

32

Based on evidence in particular cases, state judges sometimes issue orders that a domestic party not possess a firearm. Illinois br. 9. In contrast, (g)(8) can make a state court order have a legal effect that the state judge declined to impose. Thus, "a State is denied the ability to impose certain restrictions on persons without also" prohibiting their firearms rights. Royce Barondes, THE CIVIL RIGHT TO KEEP AND BEAR ARMS: FEDERAL AND MISSOURI PERSPECTIVES 178 (2023 ed.).

## III.  Amicus briefs.

This Court's opinions affirmed "the freedom of speech" for over a century before the Court actively began protecting it.[16] As judicial engagement progressed, the Court had to develop increasingly sophisticated free speech doctrines. When doing so, the Court did not rely on theories propounded by persons who considered the freedom of speech pernicious and who wanted to shrink the broad right to microscopic size.

In the instant case, some of Petitioner's amici also filed briefs in *Heller*, *McDonald*, and *Bruen*. These cases affirmed elementary, obvious points about the Second Amendment: it is a normal individual right; it is applied to the States by the Fourteenth Amendment; and it is not contingent on an individual's special need. In all three cases, some of the present amici attempted to persuade this Court to render the Second Amendment a nullity. Such amici include New York City,

---

[16] This Court's first case holding a statute to violate the freedom of speech was *Stromberg v. California*, 283 U.S. 359 (1931).

33

Chicago, the State of Illinois, several of the Religious Leaders and Organizations, and various gun control groups. Organizations that believe a right should not exist are not the best guides for the proper interpretation of that right, just as "A dissenting opinion is generally not the best source of legal advice on how to comply with the majority opinion." *Students for Fair Admissions v. President and Fellows of Harvard College*, 143 S. Ct. 2141, 2176 (2023).

Amicus Patrick Charles offers "to educate the Court" about *Bruen*. Charles br. 1. He believes that "*Bruen* fails to adhere to even basic academic standards" and that it did not invoke history "honestly or honorably." Patrick Charles, *The Fugazi Second Amendment: Bruen's Text, History, and Tradition Problem and How to Fix It*, 71 Clev. St. L. Rev. 623, 626, 629 (2023). He accuses Justice Thomas "and assuredly many others of the bench and bar" of "selectively invoking the authoritative power of history in a manner that justifies [their] own predilections." *Id.* at 638. According to Charles, "fugazi" means that "the Second Amendment, at least as articulated by *Bruen*, is historically ruined and fake." *Id.* at 627.

Mr. Charles' proposed "macro" approach amounts to interest-balancing; for at a high enough level of generality, "[e]verything is similar in infinite ways to everything else." *Bruen* at 2132 (quoting C. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 774 (1993)). This Court correctly requires analogues that, while not historical twins, are "relevantly similar." *Id.*

34

Petitioner's amici "Professors of History and Law" include some, most notably Professor Saul Cornell, whose theories were rejected by the majority and cited by the dissents in *Heller*, *McDonald*, and *Bruen*. In Professor Cornell's view of *Bruen*, "Thomas has taken law-office history to a new low, even for the Supreme Court, a body whose special brand of 'law chambers history' has prompted multiple critiques and been a source of amusement for generations of scholars and court watchers." *Bruen* was "tendentious, error-filled, and highly selective culling of evidence" and "a new low for the court." "[T]he Bizzaro constitutional universe inhabited by Thomas" is "bonkers." Professor Cornell denounces, "Thomas, Alito, and their ideological co-conspirators," and "the surreal originalist universe inhabited by Thomas and his colleagues." Having perpetrated a "historical charade," Justices "Gorsuch and Barrett" are "ideological warriors and political hacks." Saul Cornell, *Cherry-picked history and ideology-driven outcomes: Bruen's originalist distortions*, Scotusblog.com, June 27, 2022.

More politely, Professor Jack Rakove adheres to his understanding that "The entire point of the 2nd Amendment was to secure the status of the state militia in response to the Militia Clause in Art. I, sect. 8 of the Constitution. No one at the time though it had anything to do with constitutionalizing a common-law concept of self-defense." @JRakove, Twitter/X, Aug. 27, 2023.[17] Although Professor Rakove is sincere and

---

[17] https://twitter.com/JRakove/status/1695938835795136581.

35

eminent, he is not a reliable guide to interpreting a meaningful Second Amendment.

"*Bruen* should be overturned" declares a brief from a Senator who previously sent this Court a threat letter in the form of an amicus brief. Br. of Richard Blumenthal, et al., 8 n.2; Richard Blumenthal, et al., br. in *New York State Rifle & Pistol Ass'n. v. City of New York, New York*, 140 S. Ct. 1525, 1528 (2020) (Alito, J., dissenting); *Senators File an Enemy-of-the-Court Brief*, Wall St. J., Aug. 19, 2019.

The Second Amendment Law Scholars ("SALS") complain that *Bruen*'s historical test is too hard to apply, because some lower courts have disagreed on particular issues. SALS 4-5. But lower courts also sometimes disagreed in the now-discarded Two-Step Test.

Moreover, Step One of the old test, which many courts had been applying since *Heller*, is "broadly consistent" with the original meaning test adopted by *Heller* and affirmed by *Bruen*. *Bruen* at 2127. *Bruen* simply offers lower courts guidance for legal history analysis.

## CONCLUSION

Laws that were repudiated by subsequent constitutional enactments do not justify modern gun control laws. Such laws are analogues for identifying modern infringements of the right to arms.

36

Some valid historic laws are proper analogues for restricting arms rights of individuals who have been found by a court to be dangerous to others. Although the current version of 18 U.S.C. §922(g)(8) is not such a law, it easily could be, if "or" were changed to "and" after §922(g)(8)(C)(i).

The judgement below should be affirmed.

October 4, 2023          Respectfully submitted,

DAVID B. KOPEL
INDEPENDENCE INSTITUTE
727 East 16th Avenue
Denver, Colorado 80203
(303) 279-6536
david@i2i.org
*Counsel of Record*

No. 22-915

In The

# Supreme Court of the United States

_____

United States of America,

*Petitioners,*

v.

Zackey Rahimi,

*Respondent.*

_____

On Writ of Certiorari to the United States
Court of Appeals for the Fifth Circuit

_____

**Brief of National Association of Federal
Defenders as *Amicus Curiae* in Support
of Respondent**

_____

Jessica Stengel
Sarah Gannett
Judith Mizner
*Amicus Committee
Members*
National Association
of Federal Defenders

Timothy Shepherd
Carmen Smarandoiu
*Assistant Federal Public Defenders*

Vincent J. Brunkow
*Counsel of Record*
Katie Hurrelbrink
Federal Defenders of
San Diego, Inc.
225 Broadway, Ste. 900
San Diego, CA 92101
(619) 234-8467
vince_brunkow@fd.org

*Counsel for Amicus Curiae*

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES  ......................................iii

INTEREST OF AMICUS CURIAE  ...........................1

SUMMARY OF ARGUMENT ....................................2

ARGUMENT...............................................................2

I. The Second Amendment presumptively guarantees the right of "the people"—namely, all members of the national community, not just "law-abiding, responsible" individuals—to keep and bear arms.  ....................................................2

    A. Under *Heller*, the Second Amendment secures "the right of the people," who are all members of the national community.  ........4

    B. The Court's prior decisions do not limit "the people" to "law-abiding, responsible citizens."  .....................................................6

II. Petitioner's analysis of § 922(g)(8) does not comport with *Bruen*'s methodology for establishing a consistent historical tradition..........................................................9

    A. *Bruen* held that statutes addressing longstanding societal problems, like domestic violence, require a tradition of "distinctly similar" historical regulations  ................................................11

    B. Petitioner attempts to redefine its burden under *Bruen* by relying on the public "understanding" of the Second Amendment.  ...............................................13

C. Petitioner's "tradition" argument operates at too high a level of generality.................15

III.   Several metrics distinguish § 922(g)(8) from historical firearm laws, even under the "relevantly similar standard." ...................19

A. Section 922(g)(8)'s blanket ban on firearm possession is unlike less burdensome historical restrictions. ..............................20

B. Section 922(g)(8)'s blanket ban is distinct from historical laws targeting individualized risk of firearms misuse.  ...22

CONCLUSION  ........................................................25

iii

# TABLE OF AUTHORITIES

**Federal Cases**                                    **Page(s)**

*Baird v. Bonta,*
    ___ F.4th ___, 2023 WL 5763345
    (9th Cir. 2023) ...................................................... 18

*Bellotti v. Baird,*
    443 U.S. 622 (1979) ............................................ 24

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ...............................3- 8, 13, 22

*Johnson v. United States,*
    576 U.S. 591 (2015) .................................. 16-17, 19

*Kanter v. Barr,*
    919 F.3d 437 (7th Cir. 2019) ............................. 8, 9

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010) ........................................ 8, 25

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
    142 S. Ct. 2111 (2022) ....... 2, 3, 7-15, 18-21, 23-25

*Range v. Att'y Gen.,*
    69 F.4th 96 (3d Cir. 2023) (en banc) ... 3, 6, 7, 9, 17

*Stimmel v. Sessions,*
    879 F.3d 198 (6th Cir. 2018) ................................. 7

*United States v. Bullock,*
    ___ F. Supp. 3d ___, 2023 WL 4232309 (S.D. Miss.
    June 28, 2023) .................................................. 17

*United States v. Chapman,*
    666 F.3d 220 (4th Cir. 2012) ............................... 19

iv

*United States v. Daniels,*
    77 F.4th 337 (5th Cir. 2023)  6, 7, 12, 13, 17, 18, 23

*United States v. Jimenez-Shilon,*
    34 F.4th 1042 (11th Cir. 2022) ...................... 6, 20

*United States v. Meza-Rodriguez,*
    798 F.3d 664 (7th Cir. 2015) ............................ 6, 7

*United States v. Quailes,*
    ___ F. Supp. 3d ___, 2023 WL 5401733
    (M.D. Pa. Aug. 22, 2023) .................................... 18

*United States v. Rowson,*
    ___ F. Supp. 3d ___, 2023 WL 431037 (S.D.N.Y.
    Jan. 26, 2023) ....................................................... 6

*United States v. Skoien,*
    614 F.3d 638 (7th Cir. 2010) .............................. 13

*United States v. Stambaugh,*
    641 F. Supp. 3d 1185 (W.D. Okla. 2022) ............ 24

*United States v. Verdugo–Urquidez,*
    494 U.S. 259 (1990) .......................................... 4, 5

## Federal Statutes

18 U.S.C. § 922 ......... 1, 2, 9, 10, 12, 19, 20, 22, 24, 25

18 U.S.C. § 924 ...................................................... 22

18 U.S.C. § 3006A ................................................... 1

## Supreme Court Rules

Rule 37.6 .................................................................. 1

v

**Other**

1715 Md. Laws 117, ch, 26, § 32 ...............................20

1740 S.C. Acts 168, § 23 ...........................................21

1776 Penn. Laws 11, § 2 ...........................................21

Act of Feb. 16, 1787, §§ 1-3, 1 *Private and Special Statutes of the Commonwealth of Massachusetts* 145-147 (1805) .................................................................23

Act of Mar. 1, 1783, ch. 46, 1782-83 Mass. Acts 120 (1890) ......................................................................23

Act of Mar. 14, 1776, ch. VII, 1775–1776 Mass. Acts 31–35 ........................................................................21

Black's Law Dictionary (11th ed. 2019) ................. 17

Carolyn B. Ramsey, *The Stereotyped Offender: Domestic Violence and the Failure of Intervention*, 120 Penn St. L. Rev. 337 (2015) ............................. 12

English Militia Act of 1662, 13 & 14 Car. 2, c.3, § 13 (1662) ...............................23

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249 (2020) ...........................21

Leaming & Spicer, THE GRANTS, CONCESSIONS, AND ORIGINAL CONSTITUTIONS OF THE PROVINCE OF NEW JERSEY (2d ed. 1881).................................................20

Mass. Rev. Stat., ch. 134 § 16 (1836) .......................21

William Rawle, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA (2d ed. 1829) ..............24

**United States Constitution**

U.S. Const. amend. I..........................................3, 5, 20

U.S. Const. amend. II 2-9, 11, 13, 15, 18-19, 21, 24-25

U.S. Const. amend. IV  .............................................3-5

U.S. Const. amend. VI .................................................. 4

U.S. Const. amend. IX  ................................................4

U.S. Const. amend. X ..................................................4

U.S. Const. amend. XIV...........................................  20

1

## INTEREST OF AMICUS CURIAE[1]

Amicus Curiae National Association of Federal Defenders (NAFD) was formed in 1995 to enhance the representation provided to indigent criminal defendants under the Criminal Justice Act, 18 U.S.C. § 3006A, and the Sixth Amendment to the United States Constitution. NAFD is a nationwide, non-profit, volunteer organization comprised of attorneys working for federal public and community defender organizations authorized under the Criminal Justice Act. A guiding principle of NAFD is to promote the fair administration of justice by appearing as amicus curiae in litigation relating to criminal law issues affecting indigent defendants in federal court. Federal Defender organizations represent the majority of indigent defendants charged under 18 U.S.C. § 922(g)(8) and more broadly represent those charged with firearms-related offenses, so amicus has particular expertise and interest in the issues before this Court.

---

[1] Pursuant to Supreme Court Rule 37.6, counsel for amicus curiae certifies that no counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than amicus made such a monetary contribution.

2

## SUMMARY OF ARGUMENT

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2138 (2022), this Court announced a "text-and-history" test for analyzing Second Amendment challenges. First, courts must consider whether the Second Amendment's "plain text" applies to the defendant's conduct, including whether the defendant is among "the people" whom the Second Amendment protects. If so, the government must affirmatively prove that the statute in question is "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2126-27, 2129-30.

Mr. Rahimi is an American citizen and part of our national community. He is therefore among "the people," and his right to bear arms is presumptively protected. Petitioner has not rebutted that presumption by proving that § 922(g)(8) falls within our regulatory traditions. Among other failures, Petitioner misconstrues *Bruen*'s second step, rendering the Second Amendment toothless and unduly deferring to legislatures the power to disarm whomever they please. Moreover, § 922(g)(8) is more restrictive and less individualized than Petitioner's historical comparators.

## ARGUMENT

**I. The Second Amendment presumptively guarantees the right of "the people"— namely, all members of the national community, not just "law-abiding, responsible" individuals—to keep and bear arms.**

"A well regulated Militia, being necessary to the security of a free State, the right of the people to keep

3

and bear Arms, shall not be infringed." U.S. Const. amend. II. Like the First and Fourth Amendments, the Second Amendment does not circumscribe "the people" whose rights it presumptively guarantees, and which the Court described as encompassing all members of our "national community," and "not an unspecified subset." *District of Columbia v. Heller*, 554 U.S. 570, 580 (2008).

To circumvent this basic premise, Petitioner argues that there is a historical tradition of legislatures disarming those they deem "not law-abiding, responsible citizens, *regardless of whether they are among 'the people*.'" Pet.Br. 37 (emphasis added). This purported historical tradition, it claims, "exclude[s] only criminals and individuals whose possession of firearms would endanger themselves or others[.]" *Id*.

To the extent Petitioner is arguing that citizens who are not law-abiding and responsible are not among "the people" afforded Second Amendment rights, that position contravenes the constitutional mandate and this Court's jurisprudence, namely *Heller* and *Bruen*. It "devolves authority to legislatures to decide whom to exclude from 'the people,'" *Range v. Att'y Gen.*, 69 F.4th 96, 102 (3d Cir. 2023) (en banc), and relieves the government of its burden to demonstrate that a law regulating presumptively protected conduct is consistent with this Nation's historical tradition of firearm regulation. *Bruen*, 142 S. Ct. at 2126, 2130. The Court should reaffirm what it knew to be true in *Heller*, that "the people" in the Second Amendment, as in the First and Fourth Amendments, includes *all* members of the national community.

4

### A. Under *Heller*, the Second Amendment secures "the right of the people," who are all members of the national community.

More than two centuries after the Bill of Rights was ratified, *Heller* held that the Second Amendment codified a pre-existing "individual right to possess and carry weapons in case of confrontation" that does not depend on service in the militia. 554 U.S. at 592, 624. Central to the Court's decision was the Amendment's command that "the right of the people" not be infringed.

*Heller* began with a "textual analysis" of "the right of the people." *Id*. at 578. It first noted that the phrase "the right of the people" also appears in the First Amendment's Assembly-and-Petition Clause and the Fourth Amendment's Search-and-Seizure Clause. *Id*. at 579. Similarly, the Ninth Amendment provides that non-enumerated "rights" are "retained by the people." *Id*. "All three of these instances unambiguously refer to individual rights, not 'collective' rights[.]" *Id*. at 579-80.[2] Further, these provisions "refer to all members of the political community, not an unspecified subset." *Id*. at 580.

Indeed, in *Heller,* the Court noted that it had already held in the Fourth Amendment context that "the people" is "a term of art employed in select parts of the Constitution." *Id*. (quoting *United States v. Verdugo–Urquidez*, 494 U.S. 259, 265 (1990)

---

[2] While three other constitutional provisions—the preamble, Section 2 of Article I, and the Tenth Amendment—"arguably" refer to "the people" acting collectively, these provisions deal with the exercise or reservation of powers, not rights. *Heller*, 554 U.S. at 579-80.

5

(alterations omitted)). Its use in the Bill of Rights "'refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.'" *Id.* (quoting *Verdugo–Urquidez*, 494 U.S. at 265). Although the Second Amendment's prefatory clause references the "Militia," which "in colonial America consisted of a subset of 'the people'—those who were male, able bodied, and within a certain age range," *id.* —this tension confirmed that the prefatory clause did not limit the operative clause, but merely announced the purpose for which the right was codified. *Id.* at 578-81, 598-600.

The phrase "the people," then, created "a strong presumption that the Second Amendment right is exercised individually," and at minimum "belongs to *all* Americans." *Id.* (emphasis added). Combined with the common meaning of the phrase "keep and bear arms," which includes possessing and using arms for personal purposes, the operative clause "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Id.* at 592. This meaning was "confirmed" by the Second Amendment's historical background, which informed the analysis because "it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right." *Id.*

*Heller*'s discussion of "the people" was integral to its reasoning and ultimate holding. And *Heller* unambiguously held that "the people" in the Second Amendment, like "the people" in the First and the Fourth Amendments, includes all members of our national community, "not an unspecified subset." *Heller*, 554 U.S. at 580. Consistent with *Heller*,

6

appellate courts, as well as dozens of district courts around the country, have recognized that "the people" is not an unidentified subset of the national community. *See, e.g., United States v. Daniels*, 77 F.4th 337, 342 (5th Cir. 2023); *Range*, 69 F.4th at 101-03; *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1044-45 (11th Cir. 2022); *United States v. Meza-Rodriguez*, 798 F.3d 664, 670-71 (7th Cir. 2015); *United States v. Rowson*, ___ F. Supp. 3d ___, 2023 WL 431037, at *17-19 (S.D.N.Y. Jan. 26, 2023) (collecting cases).

Any other view would be contrary to long-standing precedent and would redefine fundamental rights across the board. *See Range*, 69 F.4th at 102 ("Unless the meaning of the phrase 'the people' varies from provision to provision—and the Supreme Court in *Heller* suggested it does not—to conclude that Range is not among 'the people' for Second Amendment purposes would exclude him from those rights as well. . . . And we see no reason to adopt an inconsistent reading of 'the people.'"); *Jimenez-Shilon*, 34 F.4th at 1045 ("[W]e don't see any textual, contextual, or historical reason to think that the Framers understood the meaning of the phrase to vary from one provision of the Bill of Rights to another.").

### B. The Court's prior decisions do not limit "the people" to "law-abiding, responsible citizens."

Notwithstanding its holding that "the people" in the Second Amendment encompasses all members of our national community, *Heller* also remarked that the Amendment "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. at 635.

Similarly, *Bruen* also repeatedly references "law-abiding, responsible citizens." *See*, *e.g.*, 142 S. Ct. at 2122, 2134, 2156. But those references merely reflect the plaintiffs' uncontested status as "law-abiding, responsible citizens," and are not considered pronouncements about the scope of "the people." *See Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun.").[3]

*Bruen* confirms the narrow import of *Heller*'s "law-abiding" references. Otherwise, *Heller*'s affirmance of "the right of law-abiding, responsible citizens to use arms in defense of hearth and home," 554 U.S. at 635, would impliedly render the right inoperative *outside* of the home. *Bruen*, of course, held the opposite, reasoning that "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Id*. at 2134-35. Critically, *Bruen* explained that *Heller* had not passed on the issue, and that its "remark[s]" about the

---

[3] Circuit courts have also recognized the limits of the Court's "law-abiding" references. *See*, *e.g.*, *Daniels*, 77 F.4th at 342 ("[W]e cannot read too much into the Supreme Court's chosen [law-abiding] epithet."); *Range*, 69 F.4th at 101 ("[T]he criminal histories of the plaintiffs in *Heller* . . . and *Bruen* were not at issue in those cases. So their references to 'law-abiding, responsible citizens' were dicta."); *Stimmel v. Sessions*, 879 F.3d 198, 204-05 (6th Cir. 2018) (holding that "*Heller* conclusively established" that "the Second Amendment applies to law-abiding and peaceable citizens at the very least," but "the Amendment's core does not necessarily demarcate its outer limit."); *Meza-Rodriguez*, 798 F.3d at 669 (holding *Heller*'s "law-abiding" references "did not reflect an attempt to define the term 'people.' We are reluctant to place more weight on these passing references than the Court itself did.").

8

preeminence of the need for self-defense in the home "did not suggest that the need was insignificant elsewhere.'" *Id.* at 2135 (citation omitted).

Similarly, in affirming the self-defense needs of the "law-abiding" individuals before it, *Bruen* specifically cited *Heller*'s "national community" holding. *See id.* at 2134 (citing *Heller*, 554 U.S. at 580); *see also id.* at 2156 (holding that "[t]he Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions.") (citing *Heller*, 554 U.S. at 581).

That *Heller* and *Bruen* did not specifically define "law-abiding," let alone provide any textual or historical justification for the purported narrowing of "the people" the Petitioner suggests, confirms that the Court's references to "law-abiding" people were not meant to narrow the scope of the Second Amendment. It is inconceivable that the Court would exclude, in such summary fashion, an entire, yet undefined, class of people from the purview of a long-neglected fundamental constitutional guarantee that it insisted not be treated "as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010). Yet that is precisely the result that would follow under a truncated view of "the people."

The view that non-law-abiding people "fall entirely outside the Second Amendment's scope" is not only "at odds with *Heller* itself," but also "an unusual way of thinking about rights." *Kanter v. Barr*, 919 F.3d 437, 452-53 (7th Cir. 2019) (Barrett, J., dissenting). Typically, a deprivation of rights "occurs because of

9

state action, and state action determines the scope of the loss (subject, of course, to any applicable constitutional constraints)." *Id.* Limiting "the people" to law-abiding individuals, by contrast, would strip the right "as a self-executing consequence of [a person's] new status," regardless of any legislative determination regarding the appropriate deprivation. *Id.* at 452. And it would deprive the person of standing to assert a constitutional claim because his status automatically removes him from the Second Amendment's scope. *Id.* The correct inquiry is "whether the government has the power to disable the exercise of a right that [the people] otherwise possess, rather than whether they possess the right at all." *Id.* at 453; *see also Range*, 69 F.4th at 102 (agreeing with then-Judge Barrett's dissent in *Kanter*).

The Second Amendment presumptively guarantees "the people" the right to keep and bear arms. "The people" are all members of our national community, and a regulation that excludes any members of that community, like Respondent, from the exercise of the right is presumptively unconstitutional.

## II. Petitioner's analysis of § 922(g)(8) does not comport with *Bruen*'s methodology for establishing a consistent historical tradition.

*Bruen*'s second step places the burden of proof on the government to establish that a challenged law "is consistent with this Nation's historical tradition of firearm regulation." 142 S. Ct. at 2135. The government cannot meet this burden by "simply posit[ing] that the regulation promotes an important interest." *Id.* at 2126. It is incumbent on the government to establish a historical tradition. *See id.*

at 2130 n.6, 2150. *Bruen* set out several metrics by which the sufficiency of the historical precedent should be analyzed: (1) the historical regulations' temporal proximity to the founding era, (2) their scope and prevalence, and (3) their similarity to the challenged restriction. *Bruen*, 142 S. Ct. at 2130–34, 2136, 2138.

Petitioner misunderstands *Bruen*'s second step. Petitioner argues that § 922(g)(8) is consistent with a purported tradition of disarming "persons who are not law-abiding, responsible citizens"—which, "[i]n this context," includes supposedly "dangerous individuals" such as the subjects of domestic violence protection orders (DVPOs). Pet.Br. 6, 27-28. This broad-brush effort to defend the statute is inconsistent with the methodology this Court articulated in *Bruen* for three distinct reasons. First, it ignores *Bruen*'s demand that statutes addressing longstanding problems be supported by "distinctly similar" historical regulations. Second, it relies on sources unconnected to "this Nation's historical tradition of firearm *regulation*." And third, it conducts its analysis at an impermissibly high level of generality, relying on vague, boundless descriptors like "law-abiding" and "responsible" that invite manipulation by legislatures and threaten to plunge courts back into the means-ends scrutiny *Bruen* rejected.

11

A. ***Bruen* held that statutes addressing longstanding societal problems, like domestic violence, require a tradition of "distinctly similar" historical regulations.**

*Bruen* established two different frameworks for comparing historical evidence. How similar a challenged law must be to historical restrictions depends on whether the challenged law addresses an old or new problem. Where "a challenged regulation addresses a general societal problem that has persisted since the 18th century," the inquiry is "fairly straightforward" and "relatively simple." *Bruen*, 142 S. Ct. at 2131. To show that such a statute is constitutional, the government must point to "distinctly similar historical regulation[s] addressing that problem." *Id.*

But a "more nuanced approach" may be required when a challenged statute "implicat[es] unprecedented societal concerns or dramatic technological changes," or is geared toward "unprecedented" problems that "were unimaginable at the founding." *Id.* at 2132. Rather than asking whether the challenged law and historical precursors are "*distinctly* similar," courts ask only whether they are "*relevantly* similar." *Id.* (emphasis added). The "central considerations" in this "relevantly similar" inquiry involve what *Bruen* called the "how and why": "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133.

This dichotomy is logical. Because the Second Amendment codifies a preexisting right, the

12

Founding generation's "approval or disapproval" of firearms regulations is compelling evidence of the scope of permissible regulation. *See Daniels*, 77 F.4th at 344. When the Founders faced the same problem that a modern regulation addresses, we need not speculate regarding the permissible ways to address that problem. *See Bruen*, 142 S. Ct. at 2131. But when legislatures enact statutes to address problems "that were unimaginable at the founding," the historical record will not provide as clear or definitive an answer. *Id*. at 2132. In those cases, the permissibility of modern laws targeting "unprecedented societal concerns" may be adduced only by analogy to historical restrictions. *Id*.

Petitioner argues that § 922(g)(8) and various historical regulations "'impose a comparable burden' and are 'comparably justified'"—i.e., are relevantly similar. Pet.Br. 42. But domestic abuse is a longstanding societal problem. *See, e.g.,* Carolyn B. Ramsey, *The Stereotyped Offender: Domestic Violence and the Failure of Intervention*, 120 Penn St. L. Rev. 337, 343-49 (2015) (discussing colonial laws against spouse beating and noting that "[i]n colonial New England, domestic violence offenders might be brought before a magistrate, bound over, and sentenced to a variety of punishments that often included public shaming."). Therefore, the "distinctly similar" approach applies to § 922(g)(8). *See* Resp.Br. 12–17.

*Bruen* is clear that the "distinctly similar" approach requires a tighter fit between a challenged law and historical regulations, than the "relevantly similar" test. It identified one historical regulation that "support[ed] New York's proper-cause requirement": an 1871 Texas public carry

13

statute, *id.* at 2153, which was nearly identical to New York's proper-cause requirement but held it failed to establish a regulatory *tradition. Id.* at 2153. Here, the government has identified no historical regulations that approach this level of similarity. Under *Bruen*, that is enough to decide this case.

### B. Petitioner attempts to redefine its burden under *Bruen* by relying on the public "understanding" of the Second Amendment.

Lacking a record of historical regulation of the use and possession of firearms by domestic abusers, Petitioner relies on the following:  a town's proposal to amend the state constitution; proposed but *rejected* amendments to the U.S. Constitution[4]

---

[4] Petitioner notes that the Court has deemed one of these unsuccessful proposals, from Pennsylvania, "'highly influential.'" Pet.Br. 17 (quoting *Heller*, 554 U.S. at 604). But the Court admonished that "the drafting history of the Second Amendment—the various proposals in the state conventions and the debates in Congress"—is a "dubious" source for Second Amendment interpretation. *Heller*, 554 U.S. at 603. That is because the Second Amendment was "widely understood to codify a pre-existing right, rather than to fashion a new one." *Id.*; *see also Daniels*, 77 F.4th at 352 ("The predecessors of the Second Amendment gave concrete language to possible limits on the right to bear arms. Yet that language was not adopted. Instead, the People ratified the unqualified directive: 'shall not be infringed.' U.S. CONST. amend. II."). The Court referenced Pennsylvania's minority proposal only "in the context of concluding that the Amendment codified an individual right not limited to militia service" and did not mention its limiting language, which "did not find its way into the Second Amendment." *United States v. Skoien*, 614 F.3d 638, 648 (7th Cir. 2010) (Sykes, J., dissenting).

14

and a private letter describing those proposals; statements from "Antebellum commentators," like "a legal scholar from Maine" and the mayor of a single city; a petition published in a newspaper; a "war memoir"; a Freedmen's Bureau report; and three newspaper articles. Pet.Br. 16-21.

These are not the kind of historical evidence required by *Bruen*. *See Bruen* 142 S. Ct. at 2126 (requiring a showing that the statute "is consistent with this Nation's historical tradition of firearm regulation"). The Court linked constitutionality to positive law, laid out in statute books or judicial decisions, that affirmatively prohibited particular conduct. *See, e.g.*, *id*. at 2126, 2130, 2131-32, 2135.

At no point did *Bruen* suggest the government can carry its burden by pointing to an unparticularized "understanding" of the right to keep and bear arms, as reflected in the sources Petitioner cites. The Court trained its focus only on actual historical *regulation*—i.e., "restrictions," "prohibiti[ons]," and "limit[ations]" embodied in law. *Id*. at 2138; *see, e.g.*, *id*. at 2139 ("medieval English regulations"); *id*. at 2140-41 (17th-century English "proscri[ptions]"); *id*. at 2142 (colonial and early American "practice of regulating public carry"); *id*. at 2145 (early American "public-carry restrictions"); *id*. at 2146 (mid-19th-century "statutory prohibitions"); *id*. at 2152 ("Reconstruction-era state regulations"); *id*. at 2153-54 ("gun regulation during the late-19th century"). This is the only kind of "historical evidence," *id*. at 2136, that *Bruen* treats as capable of rebutting the presumption of unconstitutionality.

15

Under *Bruen*, America's tradition of firearm regulation is the sole source on which the government can rely to justify a presumptively unconstitutional law. Since it cannot cite any, Petitioner fails to carry its burden.

## C. Petitioner's "tradition" argument operates at too high a level of generality.

When Petitioner does cite historical evidence, it improperly connects wholly disparate laws to manufacture a broad convention of "disarming those who are not law-abiding, responsible citizens." Pet.Br. 45. And among those who are irresponsible, Petitioner claims, are "dangerous individuals," which it suggests should include DVPO subjects. Pet.Br. 27-28. By relying on indeterminate and manipulable labels like "law-abiding," "responsible," and "dangerous," the argument operates at too high a level of generality and unconstitutionally excludes many "people" entitled to Second Amendment rights.

*Bruen* cautions that exceptions to "the Second Amendment's unqualified command," should be as narrow and concrete as possible. 142 S. Ct. at 2126. There, in support of its proper-cause requirement, New York had relied on a number of English and early American firearms regulations—ranging from affray laws to public carry surety statutes—that it asserted demonstrated a general governmental power to regulate the public carrying of firearms. *Id*. at 2139-45, 2146-47, 2148-50. In New York's view, these various regulations, considered together, added up to a "sweeping" power to enact "broad prohibitions on *all* forms of public carry,"

16

including "ban[ning] public carry altogether." *Id.* at 2139, 2145-46 (emphasis added).

But this Court refused to treat New York's cited regulations as more than the sum of their parts, instead interpreting each regulation narrowly. Affray laws like the Statute of Northampton prohibited nothing more than "bearing arms to terrorize the people," *id.* at 2143; 19th-century concealed-carry bans "were constitutional only if they did not similarly prohibit *open* carry," *id.* at 2146 (emphasis in original); and the cited surety statutes merely "provide[d] financial incentives for responsible arms carrying," *id.* at 2150. The Court's survey of "Anglo-American history" confirmed those "well-defined" restrictions on public carry. *Id.* at 2156. But New York could not extrapolate, from these specifics, a general power to regulate public carry more broadly, in whatever way a legislature chooses.

Here, Petitioner repeats New York's mistake, and in a more egregious manner. It aggregates discrete examples—laws disarming loyalists, minors, tramps, etc.—and derives the much broader principle that non-law-abiding, irresponsible, or dangerous groups, in general, do not enjoy the right to keep and bear arms, even if a particular group was never disarmed at the founding. This impressionistic interpretation of the historical record is not only wrong, but also dangerous, because it leaves unclear who and what might be swept under Petitioner's standard. *Cf. Johnson v. United States*, 576 U.S. 591, 595, 599, 605-06 (2015) (holding that "the Government violates [the Due Process] guarantee by taking away someone's life, liberty, or property under a criminal law so vague

17

that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement" and overruling its precedent regarding the Armed Career Criminal Act's residual clause as "hopeless[ly] indetermina[te]" and "unworkable").

The "phrase 'law-abiding, responsible citizens' is as expansive as it is vague." *Range*, 69 F.4th at 102.[5] "It cannot mean that every American who gets a traffic ticket loses her Second Amendment rights." *United States v. Bullock*, ___ F. Supp. 3d ___, 2023 WL 4232309, at *29 (S.D. Miss. June 28, 2023). But if traffic tickets do not separate the law-abiding from the non-law-abiding, or the responsible from the irresponsible, what does? There is no principled way to decide.

The word "dangerous," too, "ha[s] no true limiting principle." *Daniels*, 77 F.4th at 353. That designation is "far too broad" to guide courts in

---

[5] Petitioner offers that the phrase "law-abiding, responsible citizens," does have a "limiting principle," and excludes only "criminals and individuals whose possession of firearms would endanger themselves or others[.]" Pet.Br. 37. But to say that the non-"law-abiding" are "criminals," or that the ir-"responsible" are those who "endanger" is just to formulate in the negative the same vague concepts.

Petitioner does not explain, for instance, whether a "criminal" is "one who has committed a criminal offense" or one "who has been convicted of a crime." *Criminal*, Black's Law Dictionary (11th ed. 2019). Nor does Petitioner explain whether the term encompasses all who have ever committed, been charged with, or been convicted of, any criminal offense, no matter the nature or age of their offense. Petitioner's alternative formulations are therefore no more definite, and no less vulnerable to abuse, than its primary ones.

18

comparing groups disarmed today to groups disarmed at the founding. *Baird v. Bonta*, ___ F.4th ___, 2023 WL 5763345, at *8 (9th Cir. 2023); *see also United States v. Quailes*, ___ F. Supp. 3d ___, 2023 WL 5401733, at *12 (M.D. Pa. Aug. 22, 2023) (noting that the term's "obvious interpretive complexity" creates "uncertainty" and raises "concerns [about] the application of that standard").

A vague, malleable standard like "law-abiding," "responsible," or "dangerous" suffers from two additional shortcomings. First, it delegates to legislatures the authority to decide who is sufficiently law-breaking, irresponsible, or dangerous to be stripped of their Second Amendment rights. *See Bruen*, 142 S. Ct. at 2131 (rejecting deference to legislative interest balancing). The perils of that route are obvious. "Congress could claim that immigrants, the indigent, or the politically unpopular were presumptively 'dangerous' and eliminate their Second Amendment rights without judicial review," thereby "render[ing] the Second Amendment a dead letter." *Daniels*, 77 F.4th at 353. It was this danger that prompted the Court in *Bruen* to warn that "judicial deference" to legislatures is not "appropriate" in the Second Amendment context. 142 S. Ct. at 2131.

Second, it would require courts to scrutinize legislative classifications to determine whether they are reasonable, providing at least a limited constitutional backstop to protect against the worst abuses. Petitioner's brief invites the Court to engage in exactly this kind of analysis. It cites numerous statistics and social-science studies meant to substantiate the congressional judgment

19

that DVPO subjects are dangerous, Pet.Br. 29-32, and it repeatedly stresses that § 922(g)(8) is narrowly tailored to achieve Congress' goal, *see, e.g.*, Pet.Br. 32. But this is the precise "judge-empowering interest-balancing inquiry" this Court repudiated in *Bruen*. 142 S. Ct. at 2129. Indeed, it mirrors the reasoning lower courts used to uphold § 922(g)(8) under pre-*Bruen* means-ends balancing. *See, e.g.*, *United States v. Chapman*, 666 F.3d 220, 228 (4th Cir. 2012).

Petitioner's proposed "limitation" on the Second Amendment—"law-abiding, responsible citizens"—is therefore indeterminate, unworkable, and, at bottom, no limitation at all. Accepting it will inevitably devolve into means-ends scrutiny all over again. *Cf. Johnson*, 576 U.S. at 598-602 (recounting "nine years' experience trying to derive meaning from the [Armed Career Criminal Act's] residual clause," deeming the effort a "failed enterprise" involving "at best . . . only guesswork").

### III. Several metrics distinguish § 922(g)(8) from historical firearm laws, even under the "relevantly similar standard."

Section 922(g)(8) is inconsistent with the Nation's historical tradition of firearm regulation under both the "distinctly similar" and "relevantly similar" frameworks. *See Bruen*, 142 S. Ct. at 2131. Respondent examines in depth the ways in which § 922(g)(8) and historical firearm laws are not comparably burdensome and "comparably justified"— the *how* and *why* of the "relevantly similar" analysis. Resp.Br. 19–31. Amicus will therefore highlight just two of § 922(g)(8)'s many, fatal departures from

20

tradition in "how" it operates: it is more restrictive and much less individualized than historical precursors.

### A. Section 922(g)(8)'s blanket ban on firearm possession is unlike less burdensome historical restrictions.

Section 922(g)(8) imposes a categorical ban on all firearm possession by those under certain protective orders. While under an order, a person cannot possess a firearm anywhere, including in the home, for any purpose. This is unlike many of the historical laws relied on by Petitioner and its amici, which less onerously limited public carry or otherwise impaired the central right. "How" § 922(g)(8) functions is entirely dissimilar to historical laws that impose more limited restrictions on firearm rights. *See Bruen*, 142 S. Ct. at 2133.

Many historical firearm restrictions impaired only public carry. For example, laws targeting enslaved persons often forbade only unlicensed public carry of firearms, rather than possession more broadly.[6] *See* Leaming & Spicer, THE GRANTS, CONCESSIONS, AND ORIGINAL CONSTITUTIONS OF THE PROVINCE OF NEW JERSEY 341 (2d ed. 1881); 1715 Md. Laws 117, ch 26,

---

[6] Though Petitioner's amici rely on these class-based restrictions disarming racial or religious groups, they are notably (and commendably) absent from Petitioner's briefing. When these regulations passed, these groups were not members of "the people" and did not have a right to bear arms, so the regulations do not illuminate the right's scope. *See Jimenez-Shilon*, 34 F.4th at 1047-48.

Furthermore, these discriminatory restrictions would be unconstitutional today under the First or Fourteenth Amendments, *Range*, 69 F.4th at 104, so they are no part of any "enduring American tradition." *Bruen*, 142 S. Ct. at 2154.

21

§ 32; 1740 S.C. Acts 168, § 23. So too with the 1836 Massachusetts surety of the peace law cited by Petitioner, Pet.Br. 24, which conditioned public carry under certain limited circumstances on the posting of a surety. *See Bruen*, 142 S. Ct. at 2148 (citing Mass. Rev. Stat., ch. 134 § 16 (1836)).[7]

Many of Petitioner's cited laws included other limiting principles preventing them from operating as a complete ban. *See* Pet.Br. 22-27. Laws disarming so-called disloyal people could be overcome by pledging loyalty to the country. *See, e.g.*, Act of Mar. 14, 1776, ch. VII, 1775–1776 Mass. Acts 31–35; 1776 Penn. Laws 11, § 2; *see also* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 268 (2020) (describing Connecticut practice to disarm "'inimical' persons only 'until such time as he could prove his friendliness to the liberal cause'"). Similarly, the aforementioned surety of the peace laws returned a person's firearms upon obtaining a surety. *See* Mass. Rev. Stat., ch. 134 § 16 (1836). And other restrictions imposed a duty not to *sell* to restricted persons, but did not affirmatively disarm anybody, particularly not in their homes. *See, e.g.*, 1631 Va. Acts 173, Act. 46.

---

[7] The Court also already suggested that this law is of little historical value for Second Amendment purposes. Noting the absence of evidence that such laws were ever enforced, except pretextually against Black defendants, the Court concluded it was "surely too slender a reed on which to hang a historical tradition of restricting the right to public carry." *Bruen*, 142 S. Ct. at 2149. These statutes are inapposite for the reasons explained in Respondent's brief. Resp.Br. 24–27. As noted above, Petitioner rightly avoids relying on discriminatory historical laws, targeting racial and religious groups.

22

Section 922(g)(8) also entails the possibility of lengthy prison terms and the additional collateral consequence of permanent disarmament upon conviction. Violators face up to 15 years in prison. *See* 18 U.S.C. § 924(a)(8). And because § 922(g)(8) is a felony, a person who is convicted under this law is not only imprisoned but after serving the sentence is forever foreclosed from possessing any firearm for any purpose, even if the DVPO was only temporary. *See* 18 U.S.C. § 922(g)(1). Permanent disarmament is particularly burdensome when compared to historical practices. The laws discussed above were generally just temporary restrictions on firearm possession. Even the violent participants in Shays' Rebellion, who were able to secure pardons upon taking an oath of allegiance, surrendering their firearms, and keeping the peace for three years, had their firearms returned after a period of three years. *See* Act of Feb. 17, 1787, ch. VI, 1787 Mass. Acts. 555–56. As the *Heller* Court explained, these kinds of differences matter. "[S]ignificant criminal penalties" such as "a year in prison" are constitutionally distinguishable from less burdensome historical sanctions like fines or weapon forfeiture. 554 U.S. at 633–34.

In short, the historical regulations Petitioner cites did not impose a comparable burden to § 922(g)(8)'s complete—and often permanent—ban on firearm possession.

## B. Section 922(g)(8)'s blanket ban is distinct from historical laws targeting individualized risk of firearms misuse.

Finally, almost all of Petitioner's proffered comparators required a more individualized showing of risk than the class-based prohibition in § 922(g)(8).

23

With the exception of Revolutionary-era loyalty-oath statutes,[8] Petitioner does not cite to any class-based firearms bans enacted prior to Reconstruction. Nearly all the government's pre-Reconstruction comparators individualized in one of two ways: They permitted firearms restrictions only (1) after firearms misuse, or (2) upon finding likely danger with firearms.

Most fall in the first category. Colonial affray laws, modeled on the Statute of Northampton, imposed forfeiture penalties for using arms to terrorize the people. *Bruen*, 142 S. Ct. at 2141, 2144-45. The confiscations after Shays' Rebellion and London's Gordon riots responded to armed uprisings. *See* Act of Feb. 16, 1787, §§ 1-3, 1 *Private and Special Statutes of the Commonwealth of Massachusetts* 145-147 (1805); Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 130-131 (1994). And colonial firearms-storage laws forfeited arms for violations of gun-safety regulations. *See, e.g.*, Act of Mar. 1, 1783, ch. 46, 1782-83 Mass. Acts 120 (1890). Each law thus targeted past acts involving violent or unsafe firearms use.

Additionally, two sets of restrictions flowed from individualized risk assessments regarding firearms. First, the English Militia Act of 1662—though not a part of our historical tradition and therefore of questionable relevance, *see Daniels*, 77 F.4th at 351-52—permitted disarmament only with a warrant and a finding that the individual was a "danger[] to the

---

[8] These statutes are inapposite for the reasons explained in Respondent's brief. Resp.Br. 24–27. As noted above, Petitioner rightly avoids relying on discriminatory historical laws, targeting racial and religious groups.

24

Peace of the Kingdom." 13 & 14 Car. 2, c.3, § 13 (1662). Second, 19th-century laws conditioning public carry on posting a surety applied only if "circumstances g[ave] just reason to fear that [the individual] purposes to make an unlawful use of [arms]." *Bruen*, 142 S. Ct. at 2148 (quoting William Rawle, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA 126 (2d ed. 1829)). That is, only a "reasonable cause to fear that a person would cause an injury or breach of the peace *with a firearm*" triggered these statutes. *United States v. Stambaugh*, 641 F. Supp. 3d 1185, 1192 (W.D. Okla. 2022).

Not until the mid-19th century did legislatures begin to disarm people on a class-wide basis. But even then, Petitioner identifies just five class-based laws passed between 1850 and the end of Reconstruction in 1877, all governing possession of firearms by minors, whose constitutional rights are different than adults'. Pet.Br. 24–26.[9] By contrast, every cited class-based ban applicable to adults dates to the late 19th century—too late to "provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *See Bruen*, 142 S. Ct. at 2154.

Section 922(g)(8) requires neither form of individualization. Individuals targeted need not have

---

[9] There are at least "three reasons justifying the conclusion that the constitutional rights of children cannot be equated with those of adults: the peculiar vulnerability of children; their inability to make critical decisions in an informed, mature manner; and the importance of the parental role in child rearing." *Bellotti v. Baird*, 443 U.S. 622, 634 (1979). All three differences explain "why" legislatures limited class-based restrictions to children.

25

misused firearms. Nor must a judge find past or likely future violence *with firearms* under either § 922(g)(8)(C)(i) or (C)(ii). And notably, under § 922(g)(8)(C)(ii), it is sufficient if the judge orders the person to refrain from the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury. As long as the DVPO includes one of these prohibitions, § 922(g)(8) bars all firearms possession for the order's duration. It is therefore not comparable to individualized historical precursors.

## CONCLUSION

Last Term, the Court held unequivocally that there is "only" one way to validate a gun regulation: by showing that it accords with the Second Amendment's text and history. *Bruen*, 142 S. Ct. at 2126, 2130, 2135. Petitioner, however, eschews *Bruen*'s framework and urges a deeply flawed approach that would reinstate judicial deference to legislative interest balancing and relegate the Second Amendment, yet again, to "second-class right" status. *McDonald*, 561 U.S. at 780. The Court should reject Petitioner's invitation to rewrite *Bruen* and hold that, under a faithful application of its precedent, § 922(g)(8) is unconstitutional.

26

Respectfully submitted,


JESSICA STENGEL                   VINCENT J. BRUNKOW
SARAH GANNETT                     *Counsel of Record*
JUDITH MIZNER                     KATIE HURRELBRINK
*Amicus Committee*                FEDERAL DEFENDERS OF
*Members*                         SAN DIEGO, INC.
NATIONAL ASSOCIATION              225 BROADWAY, STE. 900
OF FEDERAL DEFENDERS              SAN DIEGO, CA 92101
                                  (619) 234-8467
TIMOTHY SHEPHERD                  vince_brunkow@fd.org
CARMEN SMARANDOIU
*Assistant Federal Public Defenders*

*Counsel for Amicus Curiae*

October 3, 2023