UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>RYAN R. VAN DYKE,<br><br>    Defendant. | Case No. 4:23-cr-00193-BLW<br><br>MEMORANDUM DECISION AND ORDER |

## INTRODUCTION

The issue before the Court is the constitutionality of a federal criminal law. The law prohibits a person from possessing a firearm while he or she is subject to a domestic violence restraining order. The government has charged Defendant Ryan Van Dyke with violating that law, and Van Dyke seeks to dismiss the charge on the grounds that the law violates his right to keep and bear arms under the Second Amendment to the United States Constitution.

The Court agrees with Van Dyke. The government seeks to prosecute Van Dyke for possessing a firearm while subject to a no-contact order. The no-contact order reportedly prohibited Van Dyke from using, threatening to use, or attempting to use physical force against an intimate partner, but it did not contain a finding that Van Dyke posed a credible threat to anyone's physical safety. History and

tradition do not support such a prosecution, and the Court will therefore dismiss the Superseding Indictment (Dkt. 16).

## BACKGROUND

The government charges Defendant Ryan Van Dyke with violating 18 U.S.C. § 922(g)(8). That provision of federal law makes it a crime to possess a firearm while subject to certain kinds of domestic violence restraining orders.[1]

On October 19, 2022, Van Dyke was arraigned in Bingham County, Idaho, on a charge of felony Stalking under Idaho Code § 18-7905. *Superseding Indictment*, Dkt. 16; *see also Gov.'s Resp.*, Ex. 1, Dkt. 30-1. During the arraignment, the state prosecutor asked the court to impose a no-contact order. *Id.*, Ex. 2, Dkt. 30-2. After confirming that Van Dyke's attorney had no objection, the court granted the prosecutor's request and, following the hearing, issued a No Contact Order pursuant to Idaho Code § 18-920 and Idaho Criminal Rule 46.2. *Id.*, Exs. 2 & 3, Dkts. 30-2 & 30-3. The order, set to expire on October 18, 2024, stated, in relevant part:

> YOU must not engage in any of the following conduct:
>
> Do not contact or attempt to contact, either personally or through another person, the protected person(s) named above in <u>any manner</u>,

---

[1] In this Order, the Court uses the term "domestic violence restraining order" to include both civil protective orders and criminal no-contact orders that meet the criteria of Section 922(g)(8)(A)–(C). *See United States v. Rahimi*, 61 F.4th 443, 449 (5th Cir. 2023), *cert. granted*, 143 S.Ct. 2688 (2023) (involving civil protective order); *United States v. Sanchez*, 639 F.3d 1201, 1201 (9th Cir. 2011) (involving criminal no-contact order).

including: 1) do not communicate in person or in writing or through any electronic means, including telephone, email, text, through social networking, or facsimile 2) do not harass, stalk, threaten, use, attempt to use or threaten use of physical force, engage in any other conduct that would place the protected person(s) in reasonable fear of bodily injury . . .

*Id.*, Ex. 3, Dkt. 30-3.

In July of 2023, the government filed an Indictment (Dkt. 2) alleging that, on May 24, 2023, while subject to the No Contact Order, Van Dyke knowingly possessed a handgun in violation of Section 922(g)(8)(C)(ii). *See also Superseding Indictment*, Dkt. 16. Three months later, Van Dyke filed a Motion to Dismiss the Indictment (Dkt. 27), arguing that the federal charges violate his Second Amendment rights.

After the parties' initial briefing on the Motion was complete, the Court scheduled oral argument for January 9, 2024. Dkt. 31. The day before the hearing, however, the Court learned that the United States Marshals had inadvertently failed to transport the defendant from FDC SeaTac to Pocatello, Idaho, to appear in-person at the hearing. Dkt. 37. Accordingly, the hearing was rescheduled for January 30, 2024. *Id.*

On January 29, the afternoon before the hearing, Van Dyke filed a Supplemental Brief (Dkt. 40) outlining a brand-new theory in support of his Motion to Dismiss. Due to the timing of that filing, the Court gave the government additional time to file a supplemental response and gave the defendant time to file

a supplemental reply. *See Hr'g Tr.* 5:25–6:7, Dkt. 48. The Motion is now fully briefed and ripe for decision.

## LEGAL STANDARDS

### I.   Dismissal of an Indictment

Rule 12(b) of the Federal Rules of Criminal Procedure allows a party to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." FED. R. CRIM. P. 12(b)(1). A motion to dismiss is generally "capable of determination" before trial if it involves questions of law rather than fact. *United States v. Nukida*, 8 F.3d 665, 669 (9th Cir. 1993). While a court may make "preliminary findings of fact necessary to decide the legal questions presented by [a] motion," it may not invade the jury's province. *Id.* That is, "a motion requiring factual determinations may be decided before trial if trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense." *United States v. Shortt Accountancy Corp.*, 785 F.2d 1448, 1452 (9th Cir. 1986) (internal quotation omitted). Under this standard, "the district court must decide the issue raised in the pretrial motion before trial if it is entirely segregable from the evidence to be presented at trial." *Id.* (internal quotation omitted).

A defendant may seek dismissal of an indictment on the grounds that the statute authorizing the charge is unconstitutional. Such a challenge may be either a

facial or an as-applied attack on the statute's constitutionality. "Facial and as-applied challenges differ in the extent to which the invalidity of a statute need be demonstrated." *Isaacson v. Horne*, 716 F.3d 1213, 1230 (9th Cir. 2013) (quoting *Legal Aid Servs. of Or. v. Legal Servs. Corp.*, 608 F.3d 1084, 1096 (9th Cir. 2010)). To succeed on a facial attack, the moving party must demonstrate that "no application of the statute could be constitutional." *Sabri v. United States*, 541 U.S. 600, 609 (2004). Conversely, an as-applied challenge is based on the statute's application to the defendant. *Spence v. Washington*, 418 U.S. 405, 414 (1974); *see also United States v. Roberts*, Case No.: 3:23-cr-00057-TMB-KFR-1, 2024 WL 50889, at *2 (D. Alaska Jan. 4, 2024) ("An as-applied challenge is the proper vehicle to challenge a statute if a 'claimed statutory defect applies to a sub-category of the people affected by the law.'") (quoting *Isaacson*, 716 F.3d at 1231).

Here, Van Dyke raises an as-applied challenge to the constitutionality of Section 922(g)(8). Although he relies upon the briefing in *United States v. Rahimi*, which involves a facial challenge, Van Dyke roots his challenge in his own unique characteristics, explaining that he is not a "violent criminal," "did not threaten anyone" with the handgun, and "has no other convictions" that would justify

restricting his right to possess firearms. *See Def.'s Mot.* at 3–4, Dkt. 27.[2] The Court

therefore considers this an as-applied challenge.

## II.    18 U.S.C. § 922(g)(8)

Van Dyke is charged with violating 18 U.S.C. § 922(g)(8). As noted, that

law prohibits the possession of firearms and ammunition by individuals who are

subject to certain kinds of domestic violence restraining orders. It provides, in

relevant part:

> It shall be unlawful for any person . . . who is subject to a court order
> that[:] (A) was issued after a hearing of which such person received
> actual notice, and at which such person had an opportunity to
> participate; (B) restrains such person from harassing, stalking, or
> threatening an intimate partner of such person or child of such
> intimate partner or person, or engaging in other conduct that would
> place an intimate partner in reasonable fear of bodily injury to the
> partner or child; and (C)(i) includes a finding that such person
> represents a credible threat to the physical safety of such intimate
> partner or child; or (ii) by its terms explicitly prohibits the use,
> attempted use, or threatened use of physical force against such
> intimate partner or child that would reasonably be expected to cause
> bodily injury . . . to . . . possess in or affecting commerce, any firearm
> or ammunition[.]

18 U.S.C. § 922(g)(8).

---

[2] During oral argument, Van Dyke's attorney likewise framed this case in as-applied terms, stating that the "real key" in this case is that, when the No Contact Order was entered, Van Dyke had "no history of firearm issues or threats with a firearm." *See Hr'g Tr.* 15:21–23, Dkt. 48. Those comments reinforce the Court's conclusion that Van Dyke asserts an as-applied challenge.

Statutory language can be dense. To simplify, three elements must be satisfied before the criminal prohibition of Section 922(g)(8) springs into effect. First, the defendant must have had an opportunity to oppose the entry of the underlying restraining order. § 922(g)(8)(A). Second, the underlying restraining order must have been imposed to prevent domestic violence. § 922(g)(8)(B). And finally, the underlying restraining order must contain one of two things: either (i) a finding that the defendant poses a "credible threat" to the "physical safety" of the protected individual(s), or (ii) "terms explicitly prohibit[ing]" the defendant from using, attempting to use, or threatening to use injurious physical force against the protected individual(s). § 922(g)(8)(C)(i) & (ii).

To prevail at trial, the government must prove each of these three elements beyond a reasonable doubt. If convicted of violating Section 922(g)(8), Van Dyke could face a fine and imprisonment for up to fifteen years. *See* 18 U.S.C. § 924(a)(8).

## III.   The Second Amendment

The Second Amendment to the United States Constitution reads: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. As the Supreme Court has held, that amendment protects the right of "ordinary, law-abiding citizens" to possess handguns at home, *District of Columbia v. Heller*, 554

U.S. 570, 635 (2008), and in public, *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 70 (2022), for self-defense. *See also McDonald v. Chicago*, 561 U.S. 742, 791 (2010).

Like all other constitutional rights, however, the right to bear arms "is not unlimited." *Heller*, 554 U.S. at 626. The government may, for example, prohibit or restrict the possession of firearms in "sensitive places," like schools and government buildings. *Id.* Likewise, as the Supreme Court has reiterated in its recent Second Amendment decisions, the government's "longstanding" practice of disarming certain categories of people, including felons and the mentally ill, is "presumptively lawful." *See id.*; *McDonald*, 561 U.S. at 786; *Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring).

In recent history, courts have analyzed Second Amendment claims under a two-step interest balancing test. *See Young v. Hawaii*, 992 F.3d 765, 783–84 (9th Cir. 2021) (en banc), *vacated*, 142 S. Ct. 2895 (2022). Under that approach, courts asked whether the challenged regulation burdened conduct that is protected under the Second Amendment, and if so, whether that burden was outweighed by the governmental interest the regulation promoted. *See id.*

In *New York State Rifle & Pistol Association., Inc. v. Bruen*, however, the Supreme Court replaced the interest-balancing approach with a new two-step test

governing Second Amendment claims. 597 U.S. at 24.[3] Under the new test, courts must first determine whether the plain text of the Second Amendment protects the individual's proposed course of conduct. *Id.* If it does, the government must then "affirmatively prove" that the challenged law is consistent with "this Nation's historical tradition of firearms regulation." *Id.* at 17 & 19. Otherwise, the law will be held unconstitutional.

Two key questions arise under *Bruen*'s first step. First, is the person who is challenging the regulation "part of 'the people' whom the Second Amendment protects"? *Bruen*, 597 U.S. at 31–32. And second, does the plain text of the Second Amendment encompass the kind of conduct in which the challenger seeks to engage? *Id.* at 32. If, after answering these questions, the court finds the plain text of the Second Amendment applicable, the conduct is presumptively protected by the constitution. *Id.* at 17.

Moving to step two, the government must rebut that presumption by showing that the regulation is consistent with "this Nation's historical tradition of firearms regulation." *Id.* This often involves "reasoning by analogy." *Id.* at 28. The

---

[3] Although the Court in *Bruen* rejected the two-part interest balancing approach "as having one step too many," *Bruen*, 597 U.S. at 19, its new standard likewise includes "two analytical steps." *Rahimi*, at 11; *see also United States v. Perez-Garcia*, No. 22-50314, No. 22-50316, 2024 WL 1151665, at *8 (9th Cir. Mar. 18, 2024) ("*Bruen* rejected this two-step approach and adopted a two-step approach of its own."). So, the old two-part test has gone, and the new is here.

government need not identify a "historical twin" or a "dead ringer" historical analogue. *Id.* at 30. Rather, in comparing modern and historical regulations, courts should consider two key metrics: "*how* and *why*" the regulations burden the "right to armed self-defense." *Id.* at 29 (emphasis added). Thus, a historic regulation is "relevantly similar" to a modern one only if it "imposed a 'comparable burden' on the right of armed self-defense and was 'comparably justified.'" *United States v. Perez-Garcia*, No. 22-50314, No. 22-50316, 2024 WL 1151665, at *10 (9th Cir. Mar. 18, 2024) (quoting *Bruen*, 597 U.S. at 29).

Ultimately, the "central question is whether the modern regulation is 'relevantly similar' to historical laws and traditions . . . so as to 'evince[ ] a comparable tradition of regulation." *Id.* (quoting *Bruen*, 597 U.S. at 27). Thus, a court should not "isolate each historical precursor and ask if it differs from the challenged regulation in some way." *Id.* at *18. Instead, courts must "examine the historical evidence as a whole." *Id.*

## DISCUSSION

Van Dyke offers two grounds for dismissing the Superseding Indictment (Dkt. 16). First, he claims the government cannot prove that he and the person protected by the No Contact Order were "intimate partners." Second, he raises an as-applied challenge to the constitutionality of Section 922(g)(8). The Court will address both of Van Dyke's arguments in turn.

## I.      Sufficiency of Evidence

Van Dyke claims that he cannot be charged under Section 922(g)(8) because the person protected by the No Contact Order was not his "intimate partner." That order, he notes, stated only that he and the protected person were "Formerly Dating." *Gov.'s Resp.*, Ex. 3, Dkt. 30-3. Thus, Van Dyke concludes, "[t]he State Court determined that [he] was not an intimate partner" of the protected person. *Def.'s Suppl. Br.* at 2, Dkt. 40. Moreover, Van Dyke argues, by testifying that the No Contact Order prohibited him from interacting with "an intimate partner," the government's witness provided the Grand Jury with "false information." *Id.* at 5–7.

Van Dyke's challenge fails for two reasons. First, it is premature. At trial, the government will have the burden of proving each element of the charged offense. It will have to show that the No Contact Order was imposed to protect an "intimate partner" of Van Dyke's, as that term is defined by law. And, ultimately, after hearing the evidence, the jury will decide whether or not the government has proven that element. *See United States v. Garretson*, No. 2:13–cr–029–APG–GWF, 2013 WL 5797611, at *6 (D. Nev. Oct. 28, 2013) ("Section 922(g)(8)(B), however, does not require that the person for whose protection the order has been issued, be explicitly identified in the order as 'an intimate partner' of the defendant. The Government, however, must prove at trial that [the protected person] was Defendant's intimate partner as defined in § 921(a)(32)."). In general,

"[t]he grand jury gets to say—without any review, oversight, or second-guessing—whether probable cause exists to think that a person committed a crime." *Kaley v. United States*, 571 U.S. 320, 328 (2014). The Court sees no reason to ignore that longstanding principle here. *See United States v. Jensen*, 93 F.3d 667, 669 (9th Cir. 1996) (quoting *United States v. Mann*, 517 F.2d 259, 267 (5th Cir. 1975)) (A criminal defendant "may not properly challenge an indictment sufficient on its face, on the ground that the allegations are not supported by adequate evidence.").

Second, contrary to Van Dyke's assertion, the state court did not affirmatively "determine[]" whether he and the protected person were intimate partners. *Def.'s Suppl. Br.* at 2, Dkt. 40. Instead, the court merely described the relationship as "Formerly Dating," without further explanation. Although people in a dating relationship are not necessarily "intimate partners," the state court's non-exclusive reference to a dating relationship does not equate to an affirmative finding that Van Dyke and the protected person were *not* intimate partners.

In sum, Van Dyke's challenge to the sufficiency of the government's evidence is premature, and his claim that the state court already resolved the "intimate partner" issue lacks merit.

## II. Van Dyke's possession of firearms is presumptively protected by the Second Amendment.

The Court turns now to Van Dyke's constitutional challenge. Under *Bruen*, the threshold question is whether Section 922(g)(8) burdens conduct that is within

the "plain text of the Second Amendment." *Bruen*, 597 U.S. at 32. If so, that conduct is presumptively protected. *Id.* at 33.

The government first argues that Van Dyke is not among "the people" who are protected by the Second Amendment. *See Gov.'s Resp.* at 2–4, Dkt. 44. According to the government, only "ordinary, law-abiding" citizens may claim the amendment's protections, and persons subject to domestic violence restraining orders fall outside that classification.

The Court disagrees. The case law does not support such a narrow view of the Second Amendment's scope. In *Heller*, the Supreme Court broadly construed the phrase "the people" as "unambiguously refer[ring] to all members of the political community, not an unspecified subset." 554 U.S. at 580. Relying upon that broad formulation, the Ninth Circuit recently emphasized that a person does not lose his Second Amendment rights merely because he is charged with a crime. *Perez-Garcia*, 2024 WL 1151665, at *9. Even when there is probable cause to believe that a defendant committed a serious felony, the accused remains a "member[] of the national community" and is "therefore not without the ability to invoke [his] constitutional right." *Id.*; *see also United States v. Chovan*, 735 F.3d 1127, 1134 (9th Cir. 2013), *abrogated on other grounds by Bruen*, 597 U.S. at 17; *United States v. Rahimi*, 61 F.4th 443, 452 (5th Cir. 2023), *cert. granted*, 143 S.Ct. 2688 (2023) (holding that imposition of a domestic violence restraining order

"alone does not suffice to remove [a person] from the political community within the amendment's scope."). Allowing the government to summarily liquidate Second Amendment rights "through mere accusation would be, at minimum, inconsistent with the presumption of innocence." *Perez-Garcia*, 2024 WL 1151665, at *9. Van Dyke is among "the people" protected by the Second Amendment.

The next question is whether the conduct that is burdened by Section 922(g)(8) is within the ambit of the Second Amendment. *Bruen*, 597 U.S. at 32. Section 922(g)(8) criminalizes the possession of any firearm or ammunition, for any reason, by a person who is subject to a domestic violence restraining order. Yet the Second Amendment broadly protects a person's right to possess a handgun at home or in public for self-defense. *See Perez-Garcia*, 2024 WL 1151665, at *10 (citing *Heller*, 554 U.S. at 570 & *Bruen*, 597 U.S. at 9–10). Section 922(g)(8) therefore "unquestionably implicates [Van Dyke's] Second Amendment rights." *Id.*

In sum, Van Dyke is among "the people" protected by the Second Amendment, and the conduct prohibited by Section 922(g)(8) plainly falls within the scope of the amendment. Van Dyke's possession of firearms is therefore

presumptively protected.[4] To save the Indictment, the government must show that its application of Section 922(g)(8)(C)(ii) to Van Dyke is consistent with this Nation's historical tradition of firearms regulation.

### III.   As applied to Van Dyke, Section 922(g)(8)(C)(ii) is not consistent with this Nation's historical tradition of firearms regulation.

The government has not demonstrated a historical tradition of firearms regulation comparable to Section 922(g)(8)(C)(ii), as applied to Van Dyke. To be sure, the government has offered evidence to show that legislatures have historically been permitted to restrict arms possession by people who were deemed unusually dangerous. But even if the government may disarm dangerous people, that does not resolve the issue before this Court. The record in this case does not indicate that the state court found Van Dyke to be unusually dangerous.[5] And,

---

[4] To be clear, this does not mean that Van Dyke has the right to possess a firearm whenever and wherever he pleases. As noted above, a variety of longstanding restrictions on firearm possession are constitutionally permissible, including prohibitions on the possession of firearms in courthouses and other government buildings. *See Heller*, 554 U.S. at 626.

[5] It is worth noting that neither party has provided the Court with a transcript or audio recording of Van Dyke's state court arraignment. And without reviewing a thorough record of those proceedings, the Court cannot know precisely what occurred. The Court notes only that, based upon the Minutes from the October 19 arraignment, the state court does not appear to have made any finding as to the potential threat that Van Dyke posed to the protected persons. If the government disagreed with this understanding of the state court proceedings, it had ample opportunity to say so. First, prior to the hearing on the Motion to Dismiss the Indictment, the Court invited the parties to file supplemental briefs addressing the significance of the apparent lack of a credible threat finding by the state court. And second, during oral argument, the Court discussed the same issue with defense counsel. Again, if the government believed that the state court *had* made a credible threat determination, it had ample opportunity to say so.

absent such a finding, the government's historical evidence related to the disarming of dangerous people cannot save this prosecution.

> **A.    There is a key difference between this case and *United States v. Rahimi*.**

Before delving into step-two of *Bruen*, it is important to distinguish this case from another case, *United States v. Rahimi*, that is currently pending before the United States Supreme Court. 61 F.4th 443. In *Rahimi*, the Fifth Circuit Court of Appeals applied *Bruen*'s two-step analysis and held that Section 922(g)(8) is unconstitutional on its face. *Id.* The Supreme Court granted certiorari, held oral argument in November 2023, and is expected to issue a decision by the end of June 2024.

Both parties in this case rely heavily upon the briefing and arguments in *Rahimi*. But these two cases differ in at least one important respect. In *Rahimi*, the defendant was charged with possessing a firearm while subject to a civil protection order that included a judicial finding that Rahimi posed a "credible threat" to the physical safety of the protected persons. *Rahimi*, 61 F.4th at 459. The credible threat finding satisfied Section 922(g)(8)(C)(i) and, in doing so, triggered the statute's criminal prohibition. *Id.* Here, in contrast, the No Contact Order entered against Van Dyke did not contain a credible threat finding and, consequently, did not satisfy Subsection (C)(i). *See Gov.'s Resp.*, Ex. 3, Dkt. 30-3. The order instead contained language explicitly prohibiting Van Dyke from using, attempting to use,

or threatening to use injurious physical force against the protected persons. According to the government, that language satisfied Subsection (C)(ii) and, in doing so, triggered Section 922(g)(8)'s criminal prohibition.

This distinction makes a difference when conducting the historical review under the second step of the *Bruen* analysis. *See* Tr. of Oral Argument at 20–23, 43–45, United States v. Rahimi, No. 22-915 (discussing distinction between Subsections (C)(i) and (C)(ii)). In *Rahimi*, the Supreme Court must determine whether disarming individuals who pose a "credible threat" to others' "physical safety" is consistent with this Nation's historical tradition of firearm regulation. Here, the Court must decide whether history and tradition support disarming a person who has not been deemed dangerous, but who has nevertheless been instructed by a state court to refrain from using, threatening to use, or attempting to use injurious physical force against others. As explained below, these two historical inquiries are not the same, and they yield different result. *See Def.'s Reply*, Ex. B, Dkt. 34, *Br. of Amici Curiae Professors of Second Amendment Law* ("Because (C)(i) requires a judicial finding of dangerousness, it does not infringe the Second Amendment. Subsection (C)(ii) does not require such a finding and is an infringement.").

   **B.    There is a historical tradition of disarming people deemed unusually dangerous.**

The government has identified various examples throughout this Nation's history of legislatures disarming individuals deemed unusually dangerous.

As early as the English Militia Act of 1662, English officials were authorized to disarm those adjudged "dangerous to the Peace of the Kingdom." Militia Act 1662, 13 & 14 Car. 2, c. 3, § 13; *see also* Diarmuid F. O'Scannlain, *Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms*, 95 NOTRE DAME L. REV. 397, 405 (2019) (explaining that use of the 1662 Militia Act "continued unabated" following adoption of the 1688-89 English Bill of Rights). On our own continent in the eighteenth century, British colonies continued that tradition by disarming various categories of individuals who were then thought to pose unique dangers to society. *See* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 WYO. L. REV. 249, 263 (2020) (describing colonial disarmament of Native Americans, Catholics, slaves, and Loyalists); *id.* at 265 ("The justification was always that those being disarmed were dangerous.").[6] And, with our founding underway, ratification debates surrounding the Second Amendment and its state-constitution equivalents further evinced an understanding

---

[6] In hindsight, we now recognize that those colonial-era disarmament laws were often premised on false and pernicious assumptions about certain minority groups. Still, however, those laws remain relevant to the extent they reflect a societal understanding that the right to bear arms did not preclude disarmament of those *believed* (rightly or wrongly) to be dangerous.

that the right to bear arms extended only to "peaceable citizens" and could be limited when necessary for the protection of particular individuals or society as a whole. *See, e.g.*, 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 627, 681 (1971). Finally, scholarly commentary and legislative history in the decades and centuries after the founding further entrenched the longstanding principle that government may disarm people deemed unusually dangerous. *See* John Holmes, *The Statesman, or Principles of Legislation and Law* 186 (1840) (A "free citizen, *if he demeans himself peaceably*, is not to be disarmed[.]") (emphasis added); *see also* Mass. Rev. Stat. ch. 134, § 16, 750 (1836) (Massachusetts surety law).

Based upon this history, the Ninth Circuit recently upheld a provision of the Bail Reform Act (BRA) that authorizes the disarmament of pretrial releasees. *Perez-Garcia*, 2024 WL 1151665, at *18. The court found a "lengthy and extensive Anglo-American tradition of disarming individuals who are not law-abiding, responsible citizens," and "whose possession of firearms would pose an unusual danger, beyond the ordinary citizen, to themselves or others." *Id.* at *14. Comparing that historical tradition to the disarmament provision of the BRA, the court found relevant similarities in "how" and "why" the historic and modern regulations burdened Second Amendment rights. *Id.* at *12.

"[I]mportantly," the Ninth Circuit explained, the BRA permits disarmament "only if it is among the least restrictive ways to 'reasonably assure the appearance of the person as required and the safety of any other person and the community.'" *Id.* at *11 & *17. That is, under the BRA, a court may only disarm a pretrial releasee when the government has established an "individualized need for applying the firearm condition against each [criminal defendant] in adversarial proceedings." *Id.* at *17. Recognizing that disarmament occurs only upon "individualized findings of dangerousness," the court upheld the law as a "clear exercise of Congress' historical legislative power to disarm those who are 'judged to be a threat to the public safety.'" *Id.* (quoting *Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir. 2019) (Barrett, J., dissenting)).

Consistent with the Ninth Circuit's decision in *Perez-Garcia*, the government's own historical evidence demonstrates that individualized risk assessments were central to the Anglo-American tradition of disarming dangerous people. Consider surety statutes, for example, which are perhaps the government's closest historical analogue to Section 922(g)(8). Surety laws, adopted by numerous states in the early nineteenth century, allowed an individual with "reasonable cause to fear an injury, or breach of the peace," to seek a court order requiring another person to either post bond or refrain from possessing "dangerous weapons." *See Bruen*, 597 U.S. at 55–56 (quoting Mass. Rev. Stat., ch. 134, § 16). But, as the

Supreme Court noted in *Bruen*, a bond could only be required if a complaint was "attended with circumstances giving just reason to fear that [the other person] purposes to make an unlawful use of [his arms]." *Bruen*, 597 U.S. at 56 (quoting William Rawle, *A View of the Constitution of the United States of America* 126 (2d ed. 1829)). In other words, before the Second Amendment right could be burdened, the person seeking the bond had to make a "specific showing" of risk. *Bruen*, 597 U.S. at 56; *see also* 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 252 (1769).

The government has demonstrated a historical tradition of restricting arms possession by individuals deemed uniquely dangerous. Yet, under each of the government's examples, an individualized risk-assessment was a prerequisite to disarmament. The remaining question, then, is whether the historical tradition reflected in those examples encompasses a law, like Section 922(g)(8)(C)(ii), that applies even to a person who has not been found to pose a credible threat to anyone.

### C.    This prosecution does not fall within the historical tradition of disarming individuals deemed unusually dangerous.

During his state court arraignment, Van Dyke apparently did not object to the prosecutor's request for a no-contact order. *See Gov.'s Resp.*, Ex. B, Dkt. 30-2. Consequently, there appears to have been little or no discussion of the need for one. After the hearing, the court entered a No Contact Order against Van Dyke that

simply prohibited him from harassing, stalking, threatening, using, attempting, or threatening to use physical force, or engaging in conduct that would create a reasonable fear of bodily injury to the protected persons. *Superseding Indictment* at 1–2, Dkt. 16. The order did not, however, contain or reference any finding by the state court that Van Dyke was dangerous or posed a threat to the protected persons. *See Gov.'s Resp.*, Ex. B, Dkt. 30-2.[7]

For that reason, this case does not fit within this Nation's historical tradition of disarming people who are deemed unusually dangerous. Under *Bruen*, to have analogical value, a historic arms regulation must be "relevantly similar" to the modern regulation that is being challenged. *Bruen*, 597 U.S. at 27. Each historic regulation cited by the government authorized disarmament only after an individualized risk assessment. *See, e.g.*, *Gov.'s Resp.* at 12 (Militia Act of 1662 authorized disarmament of those "judge dangerous"); *id.* at 14 (a proposal at Pennsylvania's ratifying convention would have permitted disarmament of those presenting a "*real danger* of public injury") (emphasis added); *id.* at 19–21 (surety laws applied where petitioners demonstrated "*reasonable cause* to fear" injury or breach of peace) (emphasis added). None of those examples are "relevantly

---

[7] Of course, the mere fact that Van Dyke was charged with a crime does not amount to an implicit finding of dangerousness. *In re Winship*, 397 U.S. 358, 363 (1970) (describing the presumption of innocence as "that bedrock axiomatic and elementary principle whose enforcement lies at the foundation of the administration of our criminal law.") (internal quotation omitted).

similar" to Section 922(g)(8)(C)(ii), as applied here, without any predicate risk assessment.

To be clear, this Court does not hold that categorical disarmament laws are always unconstitutional. On the contrary, the Supreme Court has described at least two such laws as "longstanding" and "presumptively lawful." *Heller*, 554 U.S. at 626, 627 n.26; *see also Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring) (discussing disarmament of felons and the mentally ill). And there may very well be other kinds of categorical disarmament laws that are supported by history and tradition. But we are not dealing with such laws in this case. The government has offered no historical evidence to support Congress' categorical disarmament of individuals who, dangerous or not, are subject to no-contact orders prohibiting the use, attempted use, or threatened use of physical force against intimate partners.

The government next argues that a credible-threat finding is implicit in every domestic violence restraining order. Pursuant to "traditional equitable principles," it explains, courts may only enter injunctive relief upon finding "a likelihood [of] irreparable harm" or a "presently existing actual threat." *Gov.'s Resp.* at 27, Dkt. 30 (citing 11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2948.1, at 138, 141 (2013)). Thus, the government concludes, every domestic violence restraining order is necessarily grounded in a judicial finding that a threat exists.

The Court disagrees. An individualized finding of dangerousness is not necessarily implied whenever a state district court in Idaho enters a no-contact order. Black letter law in this State vests near total discretion in the state district courts to enter no-contact orders in criminal cases. *See* Idaho Code § 18-920(1) ("When a person is charged with or convicted of an offense under [certain laws] . . . or any other offense for which a court finds that a no contact order is appropriate, an order forbidding contact with another person may be issued."). As the statute suggests, that discretion "is broad" and there is "minimal case law in Idaho" that limits its exercise. *State v. Lodge*, 461 P.3d 819, 822 (Idaho 2020).

Both the Idaho Supreme Court and the Idaho Court of Appeals have indicated that no-contact orders may be entered by district courts prior to any risk assessment. *See State v. Cobler*, 229 P.3d 374, 377 (Idaho 2009) ("The State requested a no contact order with the victim or any minor child 'until the risk can be assessed.' That was not an unreasonable request and it was not unreasonable for the magistrate judge to respond with such an order."); *State v. Maylack*, No. 48148, 2021 WL 5875475, at *2 (Idaho Ct. App. Dec. 13, 2021) (unpublished) ("The language in *Lodge*, however, does not require a specific finding of an ongoing risk. Instead, *Lodge* requires trial courts to design no-contact orders to protect a victim of the crime or potential victims. Here, the terms of the district court's no-contact order are designed to protect the son from Maylack. The district court was not, as

Maylack appears to assert, required to make a specific finding that he presented an ongoing risk of harm to the son as a prerequisite to maintaining the no-contact order."). Beyond its broad reference to "equitable principles," the government has not shown that Idaho courts only enter no-contact orders after determining that the person subject to the order is unusually dangerousness.

The government's position is also untenable when viewed within the broader context of Section 922(g)(8). As the Ninth Circuit explained in *United States v. Sanchez*, to imply a credible-threat finding with the issuance of every no-contact order would "write[] [Section 922(g)(8)(C)(i)] out of the statute." 639 F.3d at 1206. That is, "[i]f an individual's threat could be presumed" from the mere fact that a no-contact order had issued, "then there would be no need for (8)(C)(i), which is satisfied only by an express finding that an individual represents a credible threat." *Id.*; *see also United States v. Bena*, 664 F.3d 1180, 1185 (8th Cir. 2011) ("[T]he plain language [of Section 922(g)(8)(C)(ii)] may permit restriction even where there has been no judicial finding of dangerousness."). On the contrary, as the Ninth Circuit further explained in *Sanchez*, "no-contact orders may issue where no such finding is made—an individual may voluntarily consent to a no-contact order, or have little interest in challenging one." *Id.* at 1206. Indeed, that appears to be precisely what occurred in this case.

IV.    Conclusion

The government has demonstrated a historical tradition of restricting firearm possession by individuals deemed to be unusually dangerous. But this Court finds no historical support for a law, like Section 922(g)(8)(C)(ii), that disarms a person based not upon any determination of dangerousness, but on the mere fact that a state court has prohibited the person from using, threating to use, or attempting to use physical force against another.

The government cannot prosecute Van Dyke for violating a law that burdens his Second Amendment rights but lacks a basis in history. The Court will therefore grant Van Dyke's Motion (Dkt. 27) and dismiss the Superseding Indictment (Dkt. 16) in this case.

## ORDER

**IT IS ORDERED that** the pending Motion to Dismiss the Indictment (Dkt. 27) is **GRANTED**, and the Superseding Indictment (Dkt. 16) is **DISMISSED**.

DATED: April 8, 2024

B. Lynn Winmill
U.S. District Court Judge